SHEBELL & SHEBELL, LLC
John H. Sanders, II Esq. (036932001)
655 Shrewsbury Avenue, Suite 314
Shrewsbury, New Jersey 07702
Tel: (732) 663-1122
Fax: (732) 663-1144
Email: jsanders@shebell.com
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| McILWAIN, LLC a/k/a Timothy J. McIlwain, Attorney at Law. | ) ) ) CASE NO.: |
| *Plaintiff,* | ) ) |
| Vs. | ) CIVIL ACTION ) ) **COMPLAINT** |
| HAGENS BERMAN SOBOL SHAPIRO, LLP, STEVE W.BERMAN, ESQ., ROBERT B. CAREY, ESQ., LEONARD W. ARAGON, ESQ., and John Does 1-10. | ) ) ) ) ) ) |
| *Defendants.* | ) ) ) |

## INTRODUCTORY STATEMENT

Plaintiff, McIlwain, LLC brings this action against Defendants to remedy
Defendants' breach of contract of a co-counsel agreement to Plaintiff.

## PARTIES

1.      Plaintiff, McIlwain, LLC a/k/a Timothy J. McIlwain, Attorney at
Law, resides in Atlantic County, New Jersey and maintains offices at 2020 New
Road, Suite A, Linwood, New Jersey.

1

2.      Defendant, Hagens, Berman, Sobol, Shapiro, LLP ("Hagens Berman"), is, and at all relevant times was, a law firm with its principal location at 1918 Eighth Avenue, Suite 3300, Seattle, Washington.

3.      Defendant, Steve W. Berman, Esq., ("Berman"), is, and at all relevant times was, a partner in the Hagens Berman law firm that does business throughout New Jersey upon pro hac vice application, with its principal location at 1918 Eighth Avenue, Suite 3300, Seattle, Washington.

4.      Defendant, Robert B. Carey, Esq., ("Carey"), is, and at all relevant times was, a member of the Hagens Berman law firm that does business throughout New Jersey upon pro hac vice application, with an office location at 11 West Jefferson, Suite 1000, Phoenix, Arizona.

5.      Defendant, Leonard W. Aragon, Esq., ("Aragon"), is, and at all relevant times was, a member of the Hagens Berman law firm that does business throughout New Jersey upon pro hac vice application, with an office location at 11 West Jefferson, Suite 1000, Phoenix, Arizona.

## JURISDICTION AND VENUE

1.      Pursuant to 28 U.S.C. § 1332, this Court has original jurisdiction over this matter, as Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and cost.

2.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to Plaintiff's claim occurred in this District.

2

3.       Moreover, this Court can assert personal jurisdiction over Defendant because the genesis of the conduct in question was an agreement to share attorney fees between Plaintiff Timothy J. McIlwain, Esq., and Hagens Berman Law Firm that was entered into wherein the parties were to act as co-counsel and share an award of attorney fees in connection with a civil action that had been filed in the District Court of New Jersey, among other District Court matters.

4.       Further, Defendant Hagens Berman Law Firm engaged in active solicitation of Plaintiff to co-counsel with them in a pending action by contacting him at his law office in Atlantic County, New Jersey.

5.       All of the parties to this action were either (1) licensed to practice law in the State of New Jersey, (2) admitted to practice law via pro hac vice motion in the District Court of New Jersey or (3) were awaiting admission to practice law in the District Court of New Jersey via a pending pro hac vice motion.

6.       The Hagens Berman Law Firm filed an action, <u>Alston v. Electronic Arts Inc.</u>, District of New Jersey Case No. 13-cv-5157 ("Alston")  in the United States District Court, District of New Jersey, availing themselves to Jurisdiction in New Jersey prior to this breach of contract claim.

## **FIRST COUNT**

## **BREACH OF CONTRACT**

1.       Plaintiff was at all times a solo practicing lawyer as either Timothy J. McIlwain, Attorney at Law, LLC or McIlwain, LLC, originated the right of

publicity theory of liability for athletes against video game maker Electronic Arts ("EA Sports") and filed a 2009 case entitled Hart v. Electronic Arts Inc., District of New Jersey Case No. 09-cv-05990 ("Hart").

2.    Plaintiff represented Ryan Hart, from the original filing of his complaint in the New Jersey Superior Court through the time EA Sports settlement was reached in September 2013.

3.    Defendant, Hagens Berman Law Firm had filed a similar claim in the Northern District of California, entitled Keller v. Electronic Arts, Inc., Case No. 09-cv-1967 ("Keller").

4.    While both cases were pending, the *Hart* case was dismissed by the New Jersey Federal District Court, a decision that was overturned by the Third Circuit Court of Appeals in *Hart v. Electronic Arts*, 717 F.3d 141 (3rd Cir. 2013) on May 21, 2013, which decision remanded the case back to the District Court.

5.    In June 2013, Plaintiff met in San Francisco at Michael Rubin's law offices with key member of the Hagens Berman law firm (Rob Carey and Leonard Aragon) and Stuart Paynter, to discuss a plan for the *Hart* and *Keller* cases, whether to consolidate them, and to determine an equitable method for dividing the work and calculating attorney fees between the firms.

6.    On August 25, 2013, after these negotiations had begun, the Hagens Berman Law Firm filed an action based on an identical theory of liability to the *Hart* case, entitled Alston v. Electronic Arts Inc., District of New Jersey Case No. 13-cv-5157 ("Alston") in the United States District Court, District of New Jersey.

7.     The *Alston* case was critically defective because the plaintiff in that case was not a New Jersey resident and did not have standing to bring a case in the District of New Jersey.

8.     On September 10, 2013, Plaintiff and Defendants conducted a mediation with EA Sports to potentially agree to compensate approximately 100,000 college athletes forty million dollars ($40,000,000) for EA Sports to use of their images and likeness to be used in video games (i.e. rights of publicity) in settlement of all three pending actions.

9.     On September 24, 2013, the Defendant Hagens Berman Law Firm, Lanier Law Firm and the Plaintiff, in recognition of the critical strategic importance of the potential class of individuals represented by the New Jersey class in the pending *Hart* case – and the futility of the *Alston* matter, reached an agreement regarding the apportionment of attorneys' fees.  Attached hereto as *Exhibit "A"* is a true and correct copy of the e-mail containing the agreement.

10.     Under the terms of the September 24, 2013 agreement:

    a.  Defendant Hagens Berman agreed to work together with the Plaintiff in the submission of applications for fees and expenses in settlement of the cases;

    b.  Defendant Hagens Berman agreed to support the Plaintiff concerning the substance and merits of our fee submission;

    c.  Defendant Hagens Berman agreed for any fee award or agreement to our firms (Hagens Berman, the Lanier Law

Firm and Tim McIlwain), to consider those as a joint award which will be pooled together for our collective group;

d.  From the joint award to Defendant Hagens Berman, Lanier law firm and Plaintiff, "irrespective of the methodology, substance and distribution ordered by the Court", parties agree that 60% of such fees will be paid to Defendant Hagens Berman, and the remaining 40% to Lanier law firm and McIlwain; and

e.  Lanier and McIlwain will be added as counsel to the *Keller* case against the NCAA [a separate action]. *(See Exhibit A)*

11.    On September 26, 2013, Plaintiff and defendants conducted a mediation with EA Sports to potentially agree to compensate approximately 100,000 college athletes forty million dollars ($40,000,000).  A terms sheet memorializing that agreement was signed by all parties.

12.    Defendants breached the terms of the agreement and did not work together in the submission of applications for fees and expenses, or to support the substance and merits of the fee submissions.

13.    In April 2015, Plaintiff filed his application for attorney fees and costs without the cooperation or support of the Defendants, who instead contested and opposed the Plaintiff's fee and cost application, which conduct by the Defendants was a breach the September 24, 2013 agreement.

14.     The beach of the agreement to cooperate and support caused the Plaintiff to suffer consequential damages, including paying for legal support to assist in the preparation of the Plaintiff's counsel fee application.

15.     Defendants also failed to add the Plaintiff to the NCAA case referenced in the agreement, which settled for an additional twenty million dollars ($20,000,000), causing the Plaintiff to suffer additional damages in the loss of counsel fees associated with that application.

16.     On August 18, 2015 an order was entered granting final approval the $40,000,000 settlement that Plaintiff negotiated with all the parties.

17.     The total relevant counsel fee decisions of the District Court (See Exhibit B, page 2) approving the settlement were as follows:

> f.  $5,721,000 for Plaintiff's counsel in Keller;
>
> g.  $696,000 for McIlwain as counsel for Hart;
>
> h.  $2,000,000 held in escrow pending the resolution of the associated O'Bannan v. NCAA case.

18.     Under the September 24, 2013 agreement with the Defendants, these total fees should have been pooled together for the collective group, at $6,417,000 in fees.

19.     Out of the $6,417,000, these pooled fees, per the September 24, 2013 agreement, should have been split among the parties to the agreement.

20.     Rather than split these fees, the Defendants kept the entire $5,721,000 they were allocated by the court, in breach of their contractual

7

obligation to pool and split the total fees as a joint award under the September 24, 2013 agreement.

21.     As a result of Defendants Hagens Berman and the other Defendants to this action's breach of contract, Plaintiff has been damaged as he has suffered substantial economic losses directly from the breach of contract and also as a consequence of the breach of contract by the Defendants.

WHEREFORE, plaintiff demands judgment against Defendants for damages, direct and consequential, cost, interest, attorneys' fees, and injunctive relief directing that any additional fees from the $2,000,000 held in escrow be subject to pooling and distribution per the September 24, 2013 agreement, and such further relief as the Court shall deems equitable and just.

## SECOND COUNT
### GOOD FAITH AND FAIR DEALING

22.     Plaintiff hereby repeats and incorporates herein the allegations of the foregoing paragraphs of the Complaint.

23.     In every contract exists a covenant of good faith and fair dealing, a covenant that each party will refrain from doing anything, which will have the effect of destroying or injuring the right of the other to receive the fruits of the agreement.

24.     The agreement was a contract between plaintiff and defendants and contained an implied covenant of good faith and fair dealing.

8

25.     Defendant Hagens Berman's conduct towards plaintiff constitutes a breach of the covenant of fair dealing and good faith as it obviates plaintiff's fruits of the agreement, which was made to protect both parties from unfair treatment.

26.     Plaintiff has been and continues to be damaged by Defendant Hagens Berman's wrongful and unjustified conduct as set forth above.

WHEREFORE, plaintiff demands judgment against Defendants for damages, cost, interest, attorneys' fees, and injunctive relief directing that any additional fees from the $2,000,000 held in escrow be subject to pooling and distribution per the September 24, 2013 agreement, and such further relief as the Court shall deems equitable and just.

## THIRD COUNT

## INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

27.     Plaintiff hereby repeats and incorporates herein the allegations of the foregoing paragraphs of the Complaint.

28.     On or about September 24, 2013, Plaintiff entered into a contract with Defendants relating to the attorney fee award expected with the EA Sports settlement, among other things.

29.     Defendant Hagen had full knowledge of that this EA Sports settlement wherein the fee was to be shared between plaintiff and defendants whereas plaintiff had the expectancy of such economic advantage to these fees.

9

30.     Defendants wrongfully and without justification interfered with plaintiff's expectancy of economic advantage by refusing to pay Plaintiff McIlwain the fees that were due to him.

31.     As a direct and proximate result of Defendant Hagens Berman's intentional acts and conduct, plaintiff's prospective economic advantage was eliminated by virtue by defendant's attempt to deceive plaintiff on cases that he was entitled to a fee.

32.     Plaintiff has sustained significant damages as a result of defendant's wrongful conduct including but not limited to compensatory damages and for loss of reputation among former clients and other attorneys as a result of Defendant Hagens Berman's attempt to harm plaintiff's reputation, both professionally and personally, among his colleagues and former clients, such blatant bad faith warrants Plaintiff's entitlement to punitive damages for Defendant Hagens Berman's legal tactics.

WHEREFORE, plaintiff demands judgment against Defendants for damages, cost, interest, attorneys' fees, and injunctive relief directing that any additional fees from the $2,000,000 held in escrow be subject to pooling and distribution per the September 24, 2013 agreement, and such further relief as the Court shall deems equitable and just.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial on all issues in the above-entitled cause of action.

10

## DESIGNATION OF TRIAL COUNSEL

Pursuant to L.Civ.R. 101.1(c)(4), John H. Sanders, II, Esq., is hereby designated as trial counsel.

## CERTIFICATION

1.     The matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding.

2.     No other action or arbitration is contemplated herein.

3.     All parties presently known by Plaintiff are named and identified in the action filed herein.

SHEBELL & SHEBELL, LLC
Counsel for the Plaintiff

By: _____

JOHN H. SANDERS, II, ESQ.

Dated:  February 23, 2017

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| McIlwain, LLC a/k/a Timothy J. McIlwain, Attorney at Law, | Hagens Berman Sobol Shapiro, LLC, Steve W. Berman, Esq., Robert B. Carey, Esq., Leonard W. Aragon, Esq., and John Does 1-10, |

**(b)** County of Residence of First Listed Plaintiff **Atlantic**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **King**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, Email and Telephone Number)*
John H. Sanders, II, Esq., Shebell & Shebell, LLC, 655 Shrewsbury Avenue, Suite 314, Shrewsbury, NJ 07702

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question *(U.S. Government Not a Party)*

☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☒ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
28 U.S.C. § 1332
Brief description of cause:
Breach of Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE 2/23/17

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

*EXHIBIT A*

From:    Eugene Egdorf <Gene.Egdorf@LanierLawFirm.com>
Subject: EA Litigation
Date:    September 24, 2013 1:46:06 PM EDT
To:      Steve Berman <steve@hbsslaw.com>
Cc:      Robert Carey <rob@hbsslaw.com>, Timothy Mcilwain <attorneymcilwain@me.com>

Steve,

I am writing to confirm what I understand our agreement to be regarding the current proposal from Randy Wulffe to settle the EA litigation (Hart, Keller, and O'Bannon). Please confirm your agreement, or of course advise of any changes.

1.  We agree to work together in the submission of applications for fees and expenses;

2.  We agree to support each other concerning the substance and merits of our fee submissions;

3.  We agree to support each other and collectively, as appropriate, contest any applications for fees and expenses from other firms;

4.  For any fee award or agreement to our firms (Hagens Berman, The Lanier Law Firm, and Tim McIlwain), we agree to consider those as a joint award which will be pooled together for our collective group;

5.  From that joint award to our collective group, irrespective of the methodology, substance and distribution ordered by the Court, we agree that 60% of such fees will be paid to Hagens Berman, and the remaining 40% to Lanier and McIlwain:;

6.  Each of the firms can submit a request for recovery of their reasonable expenses, and we will support each other in that regard;

7.  Lanier and McIlwain will be added as counsel to the Keller case against the NCAA; the above agreement concerning the distribution of fees on a 60/40 basis will NOT apply to that relationship, which will instead be governed by either a future separate agreement or by Court Order.

Gene

-----Original Message-----
From: Steve Berman [mailto:Steve@hbsslaw.c
Sent: Tuesday, September 24, 2013 1:22 PM
To: Eugene Egdorf
Cc: Robert Carey; 'Timothy Mcilwain'
Subject: RE: EA Litigation


This is agreed


Steve Berman | Hagens Berman Sobol Shapiro ]
| Direct: (206) 268-9320

# *EXHIBIT B*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAMUEL KELLER, et al.,

     Plaintiffs,

    v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION; ELECTRONIC ARTS
INC.; and COLLEGIATE LICENSING
COMPANY,

     Defendants.

_____/

No. C 09-1967 CW

EDWARD O'BANNON, et al.

     Plaintiffs,

    v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION; ELECTRONIC ARTS
INC.; and COLLEGIATE LICENSING
COMPANY,

     Defendants.

_____/

No. C 09-3329 CW

ORDER FOR
ATTORNEYS' FEES

On August 19, 2015, this Court granted final approval of the

class action settlements in the above captioned cases.[1]  In its

final approval orders, the Court allocated twenty-nine percent of

the National Collegiate Athletic Association (NCAA) settlement

fund and thirty percent of the Electronic Arts, Inc. (EA)

settlement fund for attorneys' fees, reserving the division of

_____

[1] On September 16, 2015, Objector Nathan Jarris filed a
notice of appeal of the settlement in <u>Keller</u> and Objector Darrin
Duncan filed a notice of appeal of the partial settlement in
<u>O'Bannon</u>.  Both appeals were dismissed by stipulation on November
9, 2015.

**United States District Court**
For the Northern District of California

those funds among the attorneys. Class Counsel have filed five
separate motions for attorneys' fees and costs. Counsel for the
Plaintiff class in O'Bannon v. NCAA (O'Bannon Plaintiffs) seek
$8,000,000 in fees from EA. Docket No. 1194. Counsel for the
Plaintiff class in Keller v. NCAA (Keller Plaintiffs) seek
$8,580,000 in fees from EA and $5,800,000 in fees from the NCAA.
Docket Nos. 1196 and 1197. Current counsel for the Plaintiff
class in Hart v. EA, D.N.J. Case No. 09-5990, seek $883,177 in
fees from EA. Docket No. 1207. Finally, Timothy McIlwain, former
counsel for the Hart Plaintiffs, seeks $4,620,000 in fees from EA.
Docket No. 1193. Counsel for the various Plaintiff groups oppose
each other's motions for fees. Having considered the parties'
papers, oral argument on the motions and the record in this case,
the Court grants Keller Plaintiffs' counsel $5,800,000 in
attorneys' fees and $224,434.20 in costs from the NCAA fund. In
addition, the Court grants the following from the EA fund:
$5,721,000 in fees and $224,434.20 in costs to Keller Plaintiffs'
counsel; $4,000,000 in fees and $1,819,964 in costs to O'Bannon
Plaintiffs' counsel[2]; $260,000 in fees and $12,367.59 in costs to

---

[2] In addition, the Court directs that $2,000,000 in fees
shall be held in escrow, pending the resolution O'Bannon
Plaintiffs' counsel's motion for attorneys' fees from the NCAA.
If O'Bannon Plaintiffs' counsel are paid their fees by the NCAA,
the $2,000,000 will be paid to counsel for Keller Plaintiffs. If
O'Bannon Plaintiffs' counsel are not paid their fees by the NCAA,
the $2,000,000 will be paid to them.

current counsel for <u>Hart</u>; and $696,700 in fees and $45,810.58 in costs to former counsel for <u>Hart</u>.

BACKGROUND

I.   <u>Keller v. EA</u>, No. 09-1967, and <u>O'Bannon v. NCAA</u>, No. 09-3329

On May 5, 2009, Hagens Berman Sobol Shapiro LLP filed <u>Keller v. EA</u>, 09-1967, as a putative class action, naming EA, the NCAA and Collegiate Licensing Company (CLC) as Defendants and alleging the unlawful use of college student athletes' names, images, and likenesses in NCAA-branded football and basketball videogames produced and sold by EA.  The case asserted common law and statutory right-of-publicity (ROP) claims, a California Unfair Competition Law claim and various other common law claims.

On July 21, 2009, Hausfeld LLP filed <u>O'Bannon v. NCAA</u>, 09-3329 as a putative class action, alleging that the NCAA, its members, EA and CLC conspired to suppress to zero the amounts paid to Division I football and men's basketball players for the use of their names, images and likenesses, in violation of the Sherman Act, 15 U.S.C. § 1.  On January 15, 2010, the Court granted Plaintiffs Keller and O'Bannon's joint motion to consolidate their cases along with several other related actions pending before the Court.  <u>O'Bannon</u> Docket No. 139.  On that date, the Court appointed Hausfeld LLP and Hagens Berman Sobol Shapiro LLP as co-lead counsel in the consolidated cases, with Hausfeld taking primary responsibility for the <u>O'Bannon</u> Plaintiffs' claims and

United States District Court
For the Northern District of California

Case 4:09-cv-02320-CW Document 456 Filed 12/10/15 Page 4 of 52

Hagens Berman taking primary responsibility for the Keller

Plaintiffs' claims.

On February 8, 2010, in Keller, the Court denied EA's so-called "Anti-SLAPP" motion, one pursuant to California Code of Civil Procedure section 425.16, which addresses Strategic Lawsuits Against Public Participation (SLAPP). Keller Docket No. 150. The Court rejected EA's argument that its games were transformative works protected by the First Amendment, noting that "EA's depiction of Plaintiff in 'NCAA Football' is not sufficiently transformative to bar his California right of publicity claims as a matter of law." Docket No. 150 at 9. The Court further rejected EA's argument that "the videogame, taken as a whole, contains transformative elements," finding that the "Court's focus must be on the depiction of Plaintiff in 'NCAA Football,' not the game's other elements." Id. at 10. EA filed an interlocutory appeal of the order, which resulted in an automatic stay of Keller, including a stay of discovery by Keller Plaintiffs against EA. See Docket No. 253 at 6 (citing All One God Faith, Inc. v. Hain Celestial Group, Inc., 2009 WL 4907433, at *2 n.2 (N.D. Cal.)).

During this time, Keller Plaintiffs and O'Bannon Plaintiffs worked together to seek discovery from Defendants NCAA, CLC and relevant third parties. Both O'Bannon Plaintiffs and Keller Plaintiffs served discovery requests and obtained and indexed documents, and took and defended many depositions. Keller

Plaintiffs acknowledge that "most of the depositions covered antitrust topics unrelated to ROP claims," but state that they "monitored each deposition to identify ROP issues and protect the interests of the putative class." Keller Plaintiffs' Motion for Fees from EA, Docket No. 1196 at 5.

In addition, O'Bannon Plaintiffs sought discovery from Defendant EA, which it provided to Keller Plaintiffs. Keller Plaintiffs assert that they reviewed these materials and coded and indexed the information relevant to their case "to minimize discovery on remand." Id. Keller Plaintiffs state that, because of this work, they had "sufficient documentary evidence to move for class certification and proceed to trial against the NCAA by March 23, 2015," the Keller trial date set by the Court. Id. at 6.

At the end of August 2012, O'Bannon Plaintiffs filed their motion for class certification. Instead of opposing the motion for class certification, all three Defendants filed individual motions to strike it, arguing that O'Bannon Plaintiffs raised a new theory of liability in the motion. O'Bannon Plaintiffs opposed the motions to strike. The Court denied the motions, finding that Defendants' arguments in support of their motions to strike were "more properly considered as arguments supporting denial of the motion for class certification on its merits." Docket No. 673 at 1. Accordingly, the Court construed the motions to strike as Defendants' oppositions and set a further briefing

United States District Court
For the Northern District of California

schedule, allowing O'Bannon Plaintiffs to file a reply and Defendants to file a sur-reply. The Court heard oral argument and took the motion for class certification under submission on June 20, 2013. Docket No. 829.

On July 31, 2013, the Ninth Circuit affirmed the Court's order denying EA's Anti-SLAPP motion. In re: NCAA Student-Athlete Name & Likeness Licensing Litigation, 724 F.3d 1268 (9th Cir. 2013).[3] The Ninth Circuit rejected EA's argument that its games were protected by the First Amendment and affirmed this Court's finding as a matter of law that EA was not entitled to the transformative use defense. Id. at 1279.

II.  Hart v. EA, D.N.J. No. 09-5990

On June 15, 2009, the then-existing law firm McKenna McIlwain LLP had filed a putative class action on behalf of Plaintiffs Ryan Hart and Troy Taylor in New Jersey state court, alleging New Jersey state law, California state law, and common law claims against EA. On October 26, 2009, the firm filed an amended complaint including only Mr. Hart as named Plaintiff and eliminating the California state law claim. EA subsequently removed the case to the federal court for the District of New Jersey and filed a motion to dismiss. The District of New Jersey court dismissed all of the claims with prejudice except the right

---

[3] Following the preliminary approval of this settlement, the parties stipulated to dismissal of EA's petition for writ of certiorari to the Supreme Court. Electronic Arts Inc. v. Keller, 135 S. Ct. 42 (2014).

United States District Court
For the Northern District of California

of publicity claim, which it dismissed without prejudice.  On

October 12, 2010, Mr. Hart filed a second amended complaint

alleging only the right of publicity claim and, on November 12,

2010, EA moved for summary judgment.[4]  EA argued that the First

Amendment prohibited the right of publicity claim.  On September

9, 2011, the New Jersey court granted EA's motion for summary

judgment, finding that EA was entitled to assert a First Amendment

defense.  Hart v. Electronic Arts Inc., 808 F. Supp. 2d 757

(D.N.J. 2011).

On October 5, 2011, Mr. Hart filed a notice of appeal to the

Third Circuit.  On appeal, Mr. Hart was represented by McKenna

McIlwain and Altshuler Berzon LLP.  On January 25, 2012, Keith

McKenna filed a notice of substitution of attorney, substituting

the McKenna Law Firm, LLC for McKenna McIlwain.  On February 10,

2012, one day before Mr. Hart's opening brief was due, Mr.

McIlwain filed another notice of substitution of attorney,

substituting himself, Timothy McIlwain, Attorney at Law, LLC, for

McKenna McIlwain.  The McKenna Law Firm filed a notice of

withdrawal of appearance.

---

[4] While EA's motion for summary judgment was under
submission, the Keller Plaintiffs filed a motion before the
Judicial Panel on Multidistrict Litigation to transfer Hart and
Hubbard v. EA, E.D. Tenn. No. 09-234, to this Court to be
consolidated with Keller and other cases then pending.  Mr. Hart,
Mr. Hubbard and EA opposed the motion and, on February 4, 2011,
the MDL Panel denied the motion to transfer.  MDL No. 2212, Docket
No. 38.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    In his opening brief, Mr. Hart relied on California's

2 transformative use test, arguing that EA's use of his identity was

3 not transformative.  The concluding paragraph of the

4 transformative use section of Mr. Hart's brief noted that he

5 argued "the precise conclusion" reached by this Court in Keller.

6 Hart v. EA, 3d Cir. Case No. 11-3750, Brief Filed 2/10/2012 at 48

7 n.13.

8

9    On May 21, 2013, a panel of the Third Circuit reversed the

10 District of New Jersey court's grant of summary judgment and

11 remanded the case.  The panel held that the transformative use

12 test was "the proper analytical framework to apply to cases" such

13 as Hart.  Hart v. Electronic Arts, Inc., 717 F.3d 141, 165 (3d

14 Cir. 2013).  Applying the transformative use test, the panel held

15 that the videogames at issue did not "sufficiently transform [Mr.

16 Hart's] identity to escape the right of publicity claim."  Id. at

17 170.  The Third Circuit panel noted that Keller "is simply [Hart]

18 incarnated in California" but declined to "rely too heavily" on

19 this Court's decision which was then on appeal to the Ninth

20 Circuit.  Id. at 163 n.28.

21

22    In August 2013, Mr. McIlwain associated attorneys from the

23 Lanier Law Firm, PC as co-counsel for Mr. Hart.

24 III. Joint Efforts to Settle Claims Against EA

25

26    The parties in Keller, O'Bannon and Hart had all attempted to

27 reach settlements in their respective cases as early as 2011.

28 However, those efforts were unsuccessful.  On September 10, 2013,

the three cases proceeded to a joint mediation before Randy Wulff. During that session, Plaintiffs in all three cases reached a settlement in principle with EA that also released claims against CLC. (In this order, this settlement is referred to as the EA settlement). At the time of the mediation, Mr. Hart was represented by Mr. McIlwain. However, following the mediation, Mr. Hart rejected the settlement and replaced his counsel, re-hiring the McKenna Law Firm along with Lum, Drasco & Positan LLC (collectively, Hart Plaintiffs' counsel).

After further negotiations, Mr. Hart agreed to a settlement under terms Keller Plaintiffs' counsel describe as "substantively analogous" to those reached at the September 10, 2013 mediation. Carey Dec. at ¶ 52. The parties continued to work with Mr. Wulff to resolve issues related to the allocation of the proposed settlement fund. Part of the resolution included an agreement that Hagens Berman, counsel for Keller Plaintiffs, would pay current counsel for Hart Plaintiffs, the McKenna Law Firm and Lum, Drasco & Positan, $300,000 of any fee received from the settlement. Hagens Berman also agreed that it would not object to any lodestar amount claimed by current counsel for the Hart Plaintiffs but indicated that it would respond to any questions from the Court regarding Hart Plaintiffs' contribution to the settlement.

In May 2014, the parties filed their proposed settlement papers with the Court. Keller Plaintiffs and EA also filed a

joint motion under Federal Rule of Civil Procedure 62.1 and
Federal Rule of Appellate Procedure 12.1 for an indicative ruling.
On July 16, 2014, the Court granted the joint motion and indicated
that it would preliminarily approve the settlement, allowing for a
limited remand from the Court of Appeals.  The Ninth Circuit
granted the limited remand on July 24, 2014 and this Court finally
approved the settlement on August 19, 2015.

IV.  Continued Litigation Against and Partial Settlement with NCAA

        While settling their claims against EA, O'Bannon Plaintiffs
continued to litigate their case against the NCAA.  In November
2013, the Court granted in part and denied in part O'Bannon
Plaintiffs' motion for class certification, certifying a class of
current and former Division I football and men's basketball
players whose names, images, likenesses may be, or have been,
included in game footage or in videogames licensed or sold by the
NCAA.  Docket No. 893.  However, the Court declined to certify a
damages sub-class, finding that O'Bannon Plaintiffs failed to
present a feasible method for determining which players appeared
in videogames and were therefore eligible for monetary damages.

        O'Bannon Plaintiffs filed a motion for summary judgment and
opposed the NCAA's cross-motion for summary judgment.  On April
11, 2014, the Court granted in part and denied in part O'Bannon
Plaintiffs' motion for summary judgment and granted in part and
denied in part the NCAA's cross-motion.

While the parties' cross-motions for summary judgment in O'Bannon were under submission, Keller Plaintiffs and O'Bannon Plaintiffs attended two settlement conferences with Magistrate Judge Cousins in an unsuccessful attempt to settle their claims against the NCAA. Keller Plaintiffs continued to negotiate with the NCAA and reached an agreement in principle, which they announced on June 9, 2014, the first day of O'Bannon Plaintiffs' bench trial against the NCAA.

LEGAL STANDARD

Rule 23(h) of the Federal Rules of Civil Procedure provides, "In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Attorneys' fees provisions included in proposed class action agreements must be "fundamentally fair, adequate and reasonable." Staton v. Boeing Co., 327 F.3d 938, 964 (9th Cir. 2003).

In "common fund cases," a court has discretion to award attorneys' fees either as a percentage of such common fund or by using the lodestar method. Id. at 967-968. In the Ninth Circuit, the "benchmark" for attorneys' fees in common fund class actions is twenty-five percent of the common fund. Id. at 968. "The benchmark percentage should be adjusted . . . when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." Six Mexican Workers v. Arizona

11

United States District Court
For the Northern District of California

Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990).  "A fee award

of 30 percent is within the 'usual range' of fee awards that Ninth

Circuit courts award in common fund cases."  Garner v. State Farm

Mutual Auto Ins. Co., 2010 WL 1687829, *1 (N.D. Cal.) (citing

Vizcaino v. Microsoft, 290 F.3d 1043, 1047 (9th Cir. 2002).

    If the plaintiffs seeking fees in a class action settlement

jointly propose an allocation of those fees among co-counsel, a

court may consider "the relative efforts of, and benefits

conferred upon the class by, co-counsel" when deciding whether to

accept the proposal.  In re FPI/Agretech Sec. Litig., 105 F.3d

469, 474 (9th Cir. 1997).  A court may consider the same factors

when no such agreement exists.  See, e.g., In re Critical Path,

Inc., 2002 WL 32627559 at *10 (N.D. Cal.) (Awarding higher fees to

the firm that "undertook most of the work (including document

review and negotiation with defendants) that actually delivered

real benefit to the classes" and lower fees to the firm that "rode

its coattails and received a (close to) free ride to settlement").

DISCUSSION

I.   Fees to be Awarded

    The Court's order preliminarily approving these class action

settlements allowed Plaintiffs' counsel in the NCAA settlement to

seek up to twenty-nine percent of the NCAA settlement fund, or

United States District Court
For the Northern District of California

$5,800,000, in attorneys' fees.[5]  The order further allowed
Plaintiffs' counsel to seek up to thirty-three percent of the EA
settlement fund, or $13,200,000, in attorneys' fees.

Keller Plaintiffs' counsel seek the full $5,800,000 in fees
from the NCAA fund.  Keller Plaintiffs' counsel also request
$8,580,000 in fees from the EA fund, for a total of $14,380,000 in
requested fees from both Defendants.  Keller Plaintiffs' counsel
claim a lodestar of $6,771,390.75.  O'Bannon Plaintiffs' counsel
request $8,000,000 in fees from the EA fund and claim a lodestar
of $33,938,865.72, representing $33,438,899.20 in fees incurred as
to the NCAA, EA and CLC until September 19, 2013, the date of the
successful mediation, plus $544,966.52 in fees incurred
negotiating the settlement agreement, preparing the preliminary
approval motion and other EA-specific tasks following the
mediation.  Hart Plaintiffs' current counsel, (the McKenna Law
Firm and Lum, Drasco & Positan) claim a lodestar of $883,177 and
request that amount in fees from the EA fund.  Finally, Mr.
McIlwain claims a lodestar of $3,026,005 and requests $4,620,000
in fees from the EA fund.

Courts in the Ninth Circuit look to the following factors
when determining the proper percentage for an award of attorneys'

---

[5] Only Keller Plaintiffs' counsel seek fees from the NCAA
settlement fund.  The NCAA was not a defendant in the Hart case.
O'Bannon Plaintiffs did not settle with the NCAA.  The NCAA's
motion for de novo review of Magistrate Judge Cousins' report and
recommendation granting in part O'Bannon Plaintiffs' counsel's
motion for fees from the NCAA is currently pending.

fees: (1) the results achieved; (2) the risks of litigation;
(3) whether there are benefits to the class beyond the immediate
generation of a cash fund; (4) whether the percentage rate is
above or below the market rate; (5) the contingent nature of the
representation and the opportunity cost of bringing the suit;
(6) reactions from the class; and (7) a lodestar cross-check.
Vizcaino, 290 F.3d at 1048-52.

Here counsel obtained a combined $60,000,000 common fund for
the settlement classes.  Moreover, these cases were heavily
litigated and all work was performed on a contingency basis.
There were only three objections to the settlements, none of which
was meritorious, and 29,182 individuals filed timely claims.  In
addition, a lodestar cross-check supports an allocation above the
twenty-five percent benchmark.  Accordingly, an allocation of the
requested twenty-nine percent of the common fund for attorneys'
fees in the NCAA settlement is fair and reasonable.  See In re
Pacific Enters. Sec. Litig., 47 F.3d 373, 379 (9th Cir. 1995)
(affirming attorneys' fees comprising thirty-three percent of the
common fund when justified by the complexity of the issues and the
risks undertaken by counsel).  Only Keller Plaintiffs' counsel
seek fees under the NCAA settlement.  Accordingly, Keller
Plaintiffs' counsel's motion for fees from the NCAA settlement is
GRANTED.  Docket No. 1197.

Plaintiffs' counsel request thirty-three percent of the
common fund for attorneys' fees in the EA settlement.  The Court

14

finds that an attorneys' fee award of thirty percent of the common fund in the EA settlement is fair and reasonable. Id. The allocation of that amount among the attorneys claiminig it is addressed in the next section.

II. Allocation of EA Fees Among Plaintiffs' Counsel

Counsel for the cases settled against EA have not reached an agreement on the proper allocation of the available fees.

Keller Plaintiffs' counsel argue that they should be awarded the majority of the fees from the EA settlement because the Ninth Circuit's opinion in Keller was the catalyst for the settlement against EA. Keller Plaintiffs' counsel argue that, although O'Bannon Plaintiffs' counsel's lodestar is significantly higher than Keller Plaintiffs' counsels', much of that work concerned discovery and focused on preparation for the trial against the NCAA and was not useful to the settlement. According to Keller Plaintiffs' counsel, the potential liability EA and CLC faced based on the right of publicity claims far outweighed the liability they faced based on O'Bannon Plaintiffs' claims. Moreover, Keller Plaintiffs' counsel argue that they faced greater risks litigating their class's claims because of the mandatory fee shifting provisions in California's Anti-SLAPP and right of publicity statutes. Keller Plaintiffs' counsel further argue that Hart Plaintiffs' current counsel and Mr. McIlwain should be limited to a maximum of $700,000 in fees because their

15

participation in the settlement negotiations negatively impacted
Keller Plaintiffs' bargaining power in those negotiations.

O'Bannon Plaintiffs' counsel argue that they should be
awarded the majority of the fees from the EA settlement because
they did the majority of the work prior to settlement. Because
the Keller Plaintiffs' claims against EA were subject to a
statutorily mandated stay pending the Ninth Circuit's decision on
the appeal of the denial of the Anti-SLAPP motion and because
O'Bannon Plaintiffs were preparing to go to trial, O'Bannon
Plaintiffs' counsel were responsible for almost all of the
discovery leading up to the settlement. O'Bannon Plaintiffs'
counsel further argue that their work was the catalyst for the
settlement, noting that EA did not express interest in settling
the case until after the Court took the O'Bannon motion for class
certification under submission. O'Bannon Plaintiffs' counsel also
point out that EA would have faced treble damages under the
Clayton Act if a damages class had been certified. Finally,
O'Bannon Plaintiffs' counsel argue that their clients' claims
against NCAA also contributed to the NCAA's decision to settle
with Keller Plaintiffs, noting that the settlement between those
parties was announced just as O'Bannon went to trial.[6]

---

[6] Although O'Bannon Plaintiffs' counsel do not seek fees from
Keller Plaintiffs' settlement with the NCAA, they argue that they
should receive more of the EA fees than Keller Plaintiffs' counsel
based, in part, on their asserted contribution to the EA
settlement.

United States District Court
For the Northern District of California

Accordingly, O'Bannon Plaintiffs' counsel argue that they should receive two-thirds of the total EA fees, while Keller Plaintiffs' counsel and current and former Hart counsel should share the remaining third.

Mr. McIlwain argues that he should be awarded over $4,000,000 in fees for the work he performed in Hart.[7] He contends that it was the Third Circuit's decision in Hart that was the catalyst for the EA settlement. Mr. McIlwain notes that the Ninth Circuit panel that affirmed this Court's ruling in Keller cited and relied upon the Third Circuit's opinion in Hart. Moreover, Mr. McIlwain argues that, while he was representing the Hart class, he and Keller Plaintiffs' counsel reached an agreement that any fees awarded as part of the settlement of the right of publicity claims asserted in Hart, Keller and Alston should be split with sixty percent of the fees going to Keller Plaintiffs' counsel and forty percent going to Mr. McIlwain.

---

[7] Mr. McIlwain also moves to intervene in this case in order to seek attorneys' fees. In order to intervene as a matter of right under Federal Rule of Civil Procedure 24(a)(2), "an applicant must claim an interest the protection of which may, as a practical matter, be impaired or impeded if the lawsuit proceeds without" the applicant. Forest Conservation Council v. United States Forest Serv., 66 F.3d 1489, 1493 (9th Cir. 1995). Mr. McIlwain has no personal interest in the subject matter of this lawsuit and is not entitled to intervene as a matter of right in this case. Moreover, the Court declines to exercise its discretion to permit him to intervene. Nevertheless, the Court allows Mr. McIlwain to move for attorneys' fees for the work he performed on behalf of the Hart Plaintiffs to the extent that that work contributed to the creation of the common fund.

Finally, <u>Hart</u> Plaintiffs' current counsel seek a total of $1,183,177.00 in fees, representing their lodestar of $883,177, which they seek from the EA fund, plus the $300,000 they will receive from <u>Keller</u> Plaintiffs' counsel. <u>Hart</u> Plaintiffs' current counsel do not state an opinion on how the remainder of the fees should be allocated, except to argue that Mr. McIlwain should not be entitled to any fees.

A. Allocation of Fees between <u>O'Bannon</u> Plaintiffs' Counsel and Counsel for Plaintiffs Alleging ROP Claims

The Court must first determine how to allocate fees between <u>O'Bannon</u> Plaintiffs' counsel and counsel for Plaintiffs alleging right of publicity claims. The Court considers several factors in weighing the contribution of each set of Plaintiffs' counsel to the settlement.

1. Value of the Plaintiff Classes' Claims and Likelihood of Liability for Defendants

Each of the groups of Plaintiffs' counsel argues that their clients' claims exposed EA to the most liability and that activity in their respective case was the catalyst for the EA settlement.

<u>Keller</u> Plaintiffs' counsel argue that, if they were successful, <u>Keller</u> Plaintiffs would be entitled to statutory damages of $750 to $1000 per player in addition to disgorgement, fees, costs and punitive damages for each publication of the games. <u>See</u> Cal. Civ. Code § 3344. Moreover, <u>Keller</u> Plaintiffs' counsel argue that the Ninth Circuit's decision in their case took away EA's only viable defense to the right of publicity claims,

which pushed EA to settlement. Keller Plaintiffs' counsel further note that if EA had succeeded on its First Amendment defense, the antitrust claims "would have been worthless because the competitive market value of student-athlete images in videogames would have been zero." Keller Plaintiffs' Opp. to O'Bannon Plaintiffs' Motion, Docket No. 1212 at 7. Accordingly, Keller Plaintiffs' counsel assert that the Ninth Circuit's July 13, 2013 opinion affirming this Court's February 8, 2010 denial of EA's Anti-SLAPP motion contributed to EA's desire to settle not only the right of publicity claims, but O'Bannon Plaintiffs' claims as well.[8]

O'Bannon Plaintiffs' counsel respond that, at the time of settlement, EA faced the risk of a certified damages class, which would have exposed EA to treble damages. However, as Keller Plaintiffs' counsel point out, O'Bannon Plaintiffs' own expert stated that ninety-nine percent of their damages were attributable to live broadcasts, not to videogames. O'Bannon Plaintiffs' counsel assert that EA could have been held jointly and severally liable for such damages as part of an antitrust conspiracy. However, even assuming that EA would face such liability, O'Bannon

_____

[8] O'Bannon Plaintiffs' counsel argue that the Ninth Circuit opinion could have been reversed by the Supreme Court, noting that EA had a pending petition for writ of certiorari at the time of the settlement. However, as Keller Plaintiffs' counsel argue, this is speculative. Moreover, O'Bannon Plaintiffs' arguments rely on an equally uncertain outcome, the potential of a favorable ruling on its motion for class certification.

United States District Court
For the Northern District of California

1   Plaintiffs' counsel do not respond to Keller Plaintiffs' counsel's

2   argument that, even when trebled, O'Bannon Plaintiffs' claims were

3   worth less than Keller Plaintiffs' claims.

4       The settlement's apportionment of funds to class members

5   demonstrates that the California right of publicity claims raised

6   by Keller Plaintiffs exposed EA to the greatest liability.

7   Assuming a 100 percent claims rate for purposes of this analysis,

8   a class member with only an antitrust claim would receive $45.88

9   for each time his name appeared on a school roster, while a class

10  member with both an antitrust claim and a California right of

11  publicity claim would receive $302.83 for each time he appeared in

12  a videogame.  In other words, class members with California right

13  of publicity claims would receive $256.95 more than class members

14  with only antitrust claims, for every relevant season. [9]

15  Similarly, a class member with only a New Jersey right of

16  publicity claim as raised in Hart, would receive $82.59 per season

17  from EA.  See Carey Dec. ISO Keller Plaintiffs' Opposition, Docket

18  No. 1214, ¶ 22.

21  _____

22      [9] Mr. McIlwain argues that O'Bannon Plaintiffs' counsel's fee
    award should be based only on the $5,000,000 allocated to the
23  Antitrust-Roster-Only Subclass in the May 2014 version of the
    settlement agreement, before the parties created a single
24  settlement distribution plan for Plaintiffs raising antitrust and
    ROP claims, which allocated settlement funds by a point system.
25  However, Mr. McIlwain's proposal fails to recognize that some
    individuals who have antitrust claims also have right of publicity
26  claims.  Accordingly, it would be improper to base O'Bannon
    Plaintiffs' counsel's fees on the potential recovery of class
27  members who only have antitrust claims.

O'Bannon Plaintiffs' counsel also note that this Court took their motion for class certification under submission in June 2013, shortly before the parties reached their settlement with EA, and argue that "EA had every reason to settle the O'Bannon claims before a class certification was issued, as defendants typically do." O'Bannon Plaintiffs' Reply ISO Motion for Fees at 6. O'Bannon Plaintiffs' counsel further note that EA faced the risk of an imminent antitrust trial in O'Bannon and feared allowing "bad precedent to be set in the O'Bannon case that would have opened it up to further exposure in the Keller or Hart cases." Id. Accordingly, O'Bannon Plaintiffs' counsel argue that it was the threat of class certification and the upcoming trial in that case that caused EA to settle. Keller Plaintiffs' counsel counter that O'Bannon Plaintiffs' counsel's arguments in favor of certification of a damages class were weak and EA's arguments opposing certification were strong.[10]

The value of Keller Plaintiffs' California right of publicity claims and the likelihood that EA's strongest defense to Keller Plaintiffs' claims would be unavailable to it weigh in favor of a finding that Keller Plaintiffs' case made a more significant

---

[10] O'Bannon Plaintiffs' counsel attempt to discount the value of Keller Plaintiffs' claims, arguing that Keller Plaintiffs would have faced barriers to class certification similar to those that O'Bannon Plaintiffs faced for their damages class. However, Keller Plaintiffs' counsel have developed a player database that they could have used to support a motion for class certification. Indeed, the parties are using Keller Plaintiffs' counsel's database to assist in the administration of the settlement.

United States District Court
For the Northern District of California

contribution to the settlement fund than did O'Bannon Plaintiffs'
or Hart Plaintiffs'. However, EA faced imminent trial in O'Bannon
and, as discussed below, the work O'Bannon Plaintiffs' counsel
contributed to advance that case while Keller and Hart were stayed
must also be recognized.

2.    Time Spent on Litigation

It is undisputed that O'Bannon Plaintiffs' counsel spent many
more hours prosecuting O'Bannon through the date of the settlement
in principle than Plaintiffs' counsel spent in the other cases,
claiming a $33,938,865.72 lodestar as compared to Keller
Plaintiffs' counsel's $6,771,390.75 lodestar, Hart Plaintiffs'
current counsel's $883,177 lodestar and Mr. McIlwain's $3,026,005
lodestar. While Plaintiffs' counsel all agree that the percentage
of the fund method is the most appropriate method for awarding
fees in this case, the claimed lodestars are relevant as a cross-
check of the reasonableness of the percentage of the fund awarded
to each set of Plaintiffs' counsel.

3.    Risk Undertaken

As noted above, Keller Plaintiffs' counsel's arguments
include that they were exposed to an additional risk beyond taking
the case on a contingency basis because they were subject to
mandatory fee-shifting under California's right of publicity and

anti-SLAPP statutes.  See Cal. Civ. Code § 3344 and Cal. Code Civ.

P. § 425.16.[11]

> 4.    Potential for O'Bannon Plaintiffs' Counsel to
>       Recover Fees from NCAA

The Court must also consider that O'Bannon Plaintiffs' counsel may recover from the NCAA most of the fees they now seek. O'Bannon Plaintiffs' counsel claim a lodestar of $33,438,899.20 for work done against the NCAA, EA and CLC until the date of the settlement in principle, which includes $3,550,840.15 in fees O'Bannon Plaintiffs' counsel were able to identify as specific to claims against EA and CLC.  In addition, O'Bannon Plaintiffs' counsel claim $544,966.52 in fees incurred to finalize the settlement and seek the Court's approval.

In their litigation against the NCAA, O'Bannon Plaintiffs' counsel have already claimed their lodestar, including the amount they attribute to litigating against only EA and CLC, and excluding only the amount related to the finalization of the settlement.  As discussed above, Magistrate Judge Cousins issued a report and recommendation that the Court grant O'Bannon Plaintiffs' counsel $44,422,856.04 in attorneys' fees from the NCAA.  See O'Bannon Docket No. 405.  If O'Bannon Plaintiffs' counsel are able to collect the fees awarded from the NCAA, the

---

[11] Although Keller Plaintiffs themselves would be liable under the fee-shifting provisions, they had an agreement with their counsel that counsel would be responsible for any fees awarded under those provisions.  See Transcript, Docket No. 1240 at 14.

United States District Court
For the Northern District of California

equity of awarding them fees from this settlement will be reduced. However, there is no guarantee that they will be paid. First, this Court must consider the NCAA's objections to Magistrate Judge Cousins' report and recommendation, and the NCAA may appeal any fee awarded. In addition, on September 30, 2015, a panel of the Ninth Circuit affirmed this Court's finding of antitrust liability and affirmed in part the remedy ordered. However, O'Bannon Plaintiffs have filed a petition for rehearing en banc. The Ninth Circuit panel called for a response and the NCAA has filed an opposition to the petition. Accordingly, the Ninth Circuit mandate has not entered and either party could eventually petition for a writ of certiorari from the Supreme Court.

Balancing all of the factors discussed above, the Court finds that, if they are unable to recover their fees from the NCAA, O'Bannon Plaintiffs' counsel are entitled to half of the fees to be awarded from the EA settlement. To account for the uncertainty regarding the fees to be awarded from the NCAA, the Court orders that $4,000,000 in fees be paid to O'Bannon Plaintiffs' counsel at this time. Two million dollars shall be placed in escrow. If the NCAA pays the fee award related to the O'Bannon trial, the $2,000,000 will be paid to Keller Plaintiffs' counsel. If the fee award related to the O'Bannon trial is not paid by the NCAA, the $2,000,000 will be paid to O'Bannon Plaintiffs' counsel.

**United States District Court**
For the Northern District of California

B.   Allocation of Fees among Counsel for Plaintiffs Raising Right of Publicity Claims

Next the Court must determine the proper allocation of the remaining $6,000,000 in fees among counsel for the <u>Keller</u> Plaintiffs, the <u>Hart</u> Plaintiffs and Mr. McIlwain.  The majority of these fees will be allocated to <u>Keller</u> Plaintiffs' counsel to compensate them for the outstanding result they secured in this case and the risk they faced in litigating it.  The Court finds little evidence that the <u>Hart</u> litigation contributed to the common fund.  The Court awards some fees to compensate current and former counsel for <u>Hart</u> Plaintiffs for their work.  However, as discussed below, the Court finds insufficient evidence to support the lodestars claimed by current and former counsel for <u>Hart</u> Plaintiffs.

1.   <u>Keller</u> Plaintiffs' Counsel

As discussed above, the Court finds that the California right of publicity claims raised in <u>Keller</u> exposed EA to the greatest liability in this litigation.  Moreover, the substance and timing of the Ninth Circuit's decision as it affected the settlement weighs in favor of a finding that <u>Keller</u> Plaintiffs' claims produced the greatest benefit for the settling class.  Accordingly, the Court grants <u>Keller</u> Plaintiffs' counsel $5,721,000 in fees from the EA fund, in addition to the fees they will recover from the NCAA fund.

United States District Court
For the Northern District of California

Taking into account the $5,800,000 <u>Keller</u> Plaintiffs' counsel will recover from the NCAA fund, <u>Keller</u> Plaintiffs' counsel will receive a total of $11,521,000, representing a 1.7 multiplier of their $6,771,390.75 lodestar.  <u>Keller</u> Plaintiffs' counsel have presented evidence that they have devoted 20,061.3 hours of time since the case began, which the Court finds to be reasonable given the more than six years counsel for <u>Keller</u> Plaintiffs have worked on the case.  Counsel responded to the motions to dismiss and motions to strike, defended this Court's order on those motions on appeal, took discovery from the NCAA and created the player database being used to administer this settlement.  The Court further finds that <u>Keller</u> Plaintiffs' counsel's hourly rates are reasonable in light of their experience, as reflected in their declarations.  Moreover, the Court finds that the 1.7 multiplier is reasonable and justified in light of the risk undertaken by <u>Keller</u> Plaintiffs' counsel and the results obtained.[12]

### 2.    Current Counsel for <u>Hart</u> Plaintiffs

The Court awards current counsel for <u>Hart</u> Plaintiffs $260,000.  <u>Hart</u> Plaintiffs' counsel claim a lodestar of $883,177, representing 2,012 hours of work at rates ranging from $105 per hour to $450 per hour for the McKenna Law Firm and 646.70 hours of

---

[12] If the NCAA pays the fees sought from it by <u>O'Bannon</u> Plaintiffs' counsel and <u>Keller</u> Plaintiffs' counsel receive the $2,000,000 to be held in escrow, <u>Keller</u> Plaintiffs' counsel will receive a total of $13,521,000, representing a 2.0 multiplier. This multiplier would also be reasonable and justified in light of the risk undertaken and the results obtained.

work at rates ranging from $250 per hour to $550 per hour for Lum, Drasco & Positan. They seek this lodestar in addition to the $300,000 they will receive from Keller Plaintiffs' counsel under the agreement discussed above, for a total of $1,118,177 in fees.

In their initial submissions, Hart Plaintiffs' counsel failed to support their motion for fees with adequate time records, simply providing a summary of the total hours spent and the rate claimed for each person. The Court allowed counsel to submit declarations itemizing the hours claimed by each individual by the tasks completed. In response, counsel submitted declarations attaching contemporaneous time records. The Court finds that the time records submitted by Lum, Drasco & Positan support an award of the $238,124.50 lodestar claimed.

However, the documents submitted by the McKenna Law Firm are replete with excessive time claimed for various tasks. The Court's ability to assess the extent of the excessive time claimed is hampered by the fact that the time records submitted by the McKenna Law Firm are block billed. "Block billing is the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." Welch v. Metropolitan Line Ins. Co., 380 F.3d 942, 945 n.2 (9th Cir. 2007) (internal quotation marks and citations omitted). The Ninth Circuit has recognized that "block billing makes it more difficult to

United States District Court
For the Northern District of California

determine how much time was spent on particular activities." Id. at 948.

For example, the records claim over 140 hours devoted solely to preparing the 900 page appendix for the appeal to the Third Circuit. See McKenna Decl., Docket No. 1274, Ex. A at 19-21, Entries for work performed 12/15/2011-2/6/2012. Over eighteen hours of additional block-billed entries include work on the appendix, along with other tasks. Id. The 140 hours is itself excessive, and it is impossible for the Court to determine how much of the other block-billed time is related to the appendix.[13]

Another example of excessive billing compounded by block billing is the time spent by Mr. McKenna reviewing and responding to EA's motion to dismiss the complaint. Mr. McKenna claimed eight hours on January 14, 2010 to "Review EA's motion to dismiss." He claimed six more hours on January 15 to "Continued review of motion to dismiss." Finally, he claimed an additional six hours on January 16 for "Continued review of motion to dismiss" for a total of twenty hours reviewing a thirty-five page motion with one supporting declaration that was less than forty pages long, including exhibits. In addition, Mr. McKenna had a block-billed entry on January 18, claiming four hours to "Research

---

[13] The Court notes that Mr. McKenna's former law partner, Mr. McIlwain, seeks fees for an additional twenty-four hours of work by paralegal Katie Saluzzi for the preparation of the Appendix. See Declaration of Katie Saluzzi, Docket No. 1276-7, Ex. B at 1.

case law cited in motion to dismiss; communication with Rosen re: scheduling and settlement." From January 25, 2010 through March 5, 2010, Mr. McKenna had block-billed entries claiming over eighty five additional hours for tasks primarily related to the opposition to the motion to dismiss. Other McKenna Law Firm time-keepers claimed more than fifty additional hours related primarily to reviewing the motion to dismiss and preparing the opposition to it, in addition to the time claimed by Mr. McKenna.[14]

An example of excessive time spent on tasks that likely had little impact on the success of the litigation is the more than 111 hours claimed in June and July 2009 to creating the website "youareinthegame.org."[15] The website contains a brief paragraph describing the use of names, images and likenesses in videogames, three side-by-side comparisons of game photos to images from videogames, links to two articles about the Hart and Keller litigation, and a form where college athletes can fill in their information "to be added to the list for consideration in this case." Not only is the amount of time devoted to creating the

---

[14] In addition, Mr. McKenna's former law partner, Mr. McIlwain, seeks fees for other people for over 100 hours of work on the motion to dismiss. See, e.g., Jorgensen Dec., Docket No. 1276-4 at Ex. A (claiming sixty-five hours of work in February 2010, primarily related to Plaintiff's opposition to the motion to dismiss); Mullen Dec., Docket No. 1276-5 at ¶ 3 (claiming at least 62.5 hours of work related to motion to dismiss).

[15] The Court notes that Mr. McKenna's former law partner, Mr. McIlwain, seeks fees for an additional thirty-five hours of work by law student Alex Settle for the creation of this website. See Declaration of Alex Settle, Docket No. 1276-8 at ¶ 2.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

website excessive, but there is no evidence that information gathered from the website contributed to the success of the litigation in any manner.

These are only examples of excessive time entries. There are many more. See, e.g., June 22, 2009 Entry (claiming eight hours to "Supervise law clerk and paralegals re: organization of legal research, investigation material and file material"); February 19, 2010 Entry (claiming four hours to "Review FRCP re: pleading standard); October 13, 2010 Entry (claiming one hour to "Emailed copy of second amended complaint to opposing counsel); November 16, 2010 Entry (claiming four hours to "Printed documents from ECF system online and filed in binder for KAM" when there were only thirty-six entries on the ECF docket as of that date); December 23, 2010 Entry (claiming one hour to "Send in proof of service for Filing 24"); October 15, 2011 Entry (claiming one hour by a partner to "E-filed notice of appeal").

In addition to the block-billed and excessive entries, the McKenna time records include many vague entries. For example, the entries contain over 140 hours of time claimed for unspecified legal research and memo writing. See also, e.g., June 4, 2009 Entry (claiming six hours for "Continued research into EA's use of player likeness); June 6, 2009 Entry (claiming eight hours by a partner to "Review data, documents and internet material re: EA's marketing a video game"); October 9, 2010 Entry (claiming two hours to, among other things, "review blogs"); November 18, 2011

30

Entry (claiming one hour to "Prepared index of box"); January 20, 2014 Entry (claiming two hours to "Research docket sheet re: CA Action").

Because the McKenna Law Firm's records are replete with excessive and vague entries, the evaluation of which is made even more difficult by block billing, the Court reduces the lodestar claimed by the firm by sixty percent to $258,021. Accordingly, the total lodestar for Hart Plaintiffs' current counsel is $496,145.50.

Hart Plaintiffs' current counsel further argue that they should receive their lodestar in addition to the $300,000 they will be paid by Keller Plaintiffs' counsel under the agreement discussed above. Hart Plaintiffs' current counsel argue that the $300,000 payment should be in addition to their lodestar because the agreement with Keller Plaintiffs' counsel "acknowledges the overlap of the classes between the Keller and Hart matters and was intended to recognize New Jersey ROP Class Counsel's contribution [to] the class as a whole, beyond the class members whose claims arose only under New Jersey's Right of Publicity law." McKenna Dec., Docket No. 1274 at ¶ 2. However, as noted above, the Court finds little evidence that the Hart litigation contributed to the common fund and that Hart Plaintiffs' current and former counsel are only entitled to some fees to compensate them for the work performed. Accordingly, the Court will deduct from the lodestar the $300,000 that current counsel for Hart will receive from

Keller Plaintiffs' counsel for a total award of $260,000 from the EA fund.

3. Former Counsel for Hart Plaintiffs

Finally, the Court awards former Hart counsel, Mr. McIlwain, the individuals he claims to have supervised and his co-counsel, the Lanier Law Firm, $696,700 in fees.[16]

a. Mr. McIlwain

Mr. McIlwain claims a lodestar of $2,070,175, representing 2,453.20 hours billed at a rate of $850 an hour. However, Mr. McIlwain does not provide any evidence that $850 is his customary hourly rate. Indeed, the declaration of Michael Rubin, which Mr. McIlwain filed in support of his motion for fees, states Mr. Rubin's belief that Mr. McIlwain's "lodestar adopts and applies an hourly rate of $750 per hour." Rubin Dec. at ¶. 8. In addition, Mr. McIlwain's former partner Mr. McKenna claimed an hourly rate of $450. Accordingly, the Court reduces Mr. McIlwain's hourly rate to $550, with a corresponding lodestar reduction to $1,349,260.

Moreover, the Court notes that Mr. McIlwain's records claim time for travel with no apparent relevant purpose. For example,

---

[16] In his supplemental declaration, Mr. McIlwain states that he welcomes an order that payment from the EA fund be made directly to the individuals on whose behalf he seeks fees. To the extent the Court awards fees to the individuals Mr. McIlwain claims to have supervised, the Court orders that the fees shall be paid directly to them. Within one week of the date of this order, Mr. McIlwain shall provide counsel for EA with the necessary information for those payments to be made.

the records claim 8.30 hours of time for "Travel from NYC to Los Angeles" on November 24, 2010. However, there is nothing in the subsequent time entries that indicates a case-related reason for Mr. McIlwain's trip. McIlwain Decl., Ex. A at 19. See also, e.g., id. at 5 (11.80 hours claimed on February 10, 2009 for "Travel from Newark to Los Angeles"); id. at 19 (6.20 hours claimed on April 28, 2009 for "Travel to California"). In addition, Mr. McIlwain's time record includes hundreds of hours for entries that claim "research and discuss" or "review" a single case. For example, Mr. McIlwain claims 3.10 hours of time on October 3, 2009 to "Research and Discuss Namath v. Sports Illustrated." Id. at 12. It is not clear why this short New York state court opinion warranted 3.10 hours of research and discussion. See also, e.g., id. at 6 (claiming 2.50 hours to "Research and discuss White v. Samsung Electronics America, Inc."; claiming 3.40 hours to "Research and Discuss Kimbragh v. Coca-Cola/USA"). In other instances, Mr. McIlwain claims what appears to be excessive time for simple tasks, see, e.g., id. at 27 (claiming 4.20 hours on January 13, 2012, to "Research the rules for admission to the 3rd circuit court of appeals and conference with paralegal to put task together for admission"), or work that does not appear to be reasonably related to the settlement in this case, see, e.g., id. at 25 (claiming 2.30 hours to "Investigate talent agency addresses and lead agents"; claiming 6.20 hours to "Research games that are similar to movies; analysis [sic] films

that could become video games; research the sales of war video games like 'Call of Duty'; Watch Oceans 13; imdb actors in Oceans 13 movie"; claiming 3.40 hours to "Research Matt Damon; George Clooney; Don Cheatle; Bernie Mack; Ellen Barkin; Andy Garcia; Brad Pitt background"; claiming 3.70 hours to "Analysis [sic] biographical information for Matt Damon; George Clooney; Don Cheadle; Bernie Mack; Ellen Barkin; Andy Garcia; Al Pacino; Brad Pitt; image in Oceans 13 movie and correlate likeness to new video game"). Still other entries are vague. For example, Mr. McIlwain has numerous entries for "memo to file" without a topic. See also, e.g., id. at 26 (claiming 3.20 hours to "Review file contents").

The Court also notes that between April 18, 2013 and May 17, 2013, while the case was under submission with the Third Circuit, Mr. McIlwain billed a total of 9.80 hours to multiple entries labeled as "Conference call with Katie Saluzzi re: Status of Case" but performed no other work on the case. Id. at 42. Ms. Saluzzi was a paralegal working with Mr. McIlwain on the case. Her time records show similar time entries for these phone calls, but also show no other work on the case. Saluzzi Dec., Docket No. 1276-7, Ex. B at 3 (billing a total of 10.75 hours for phone calls with Mr. McIlwain during the same time period). It is not clear how approximately ten hours of conversations between an attorney and a paralegal that neither stemmed from tasks performed nor led to tasks being performed during a time period when there was no

34

United States District Court
For the Northern District of California

activity in the case could be reasonably related to the litigation or successful resolution of the case.

Finally, as discussed more fully below, Mr. McIlwain claims almost $500,000 in fees on behalf of paralegals, law students and attorneys who he claims to have supervised. As will be discussed below, it appears that there is little basis for either the hours or the hourly rates he claims for those individuals. The Court finds that Mr. McIlwain's willingness to seek those fees calls into question the reliability of his own time records.

Because Mr. McIlwain's time records are replete with entries that are not reasonably related to the litigation or settlement of the case and because the Court questions the reliability of the records, the Court reduces his adjusted lodestar by an additional seventy percent. The Court awards Mr. McIlwain $405,000 in attorney's fees.

b.    Work Supervised by Mr. McIlwain

Mr. McIlwain also claims a lodestar of $491,360 on behalf of other attorneys, law students and paralegals he supervised, representing 1,169.7 hours of time billed at rates ranging from $215 per hour to $850 per hour. In his original filing, Mr. McIlwain did not provide sufficient evidence to support a finding that the hourly rates claimed were reasonable, nor did he provide time records for any of the individuals. In addition, Mr. McIlwain declared that he is a "solo lawyer" and stated that he was claiming time for individuals he "employed and was associated

with for the purpose of investigating and prosecuting the Hart case." McIlwain Dec. at ¶ 1, 19. Noting that Mr. McIlwain provided no evidence that he paid these individuals the amounts he claimed on their behalf, or that he had been authorized to seek fees on their behalf and would pay any fees ordered over to them in full, the Court directed Mr. McIlwain to file declarations by each of these individuals which itemize the hours claimed by the tasks completed and state the hourly rate or rates the individual actually charged Mr. McIlwain for the work he or she performed and the number of hours for which the individual was actually paid by Mr. McIlwain.

Mr. McIlwain has now filed declarations from nine of these ten individuals. Because Mr. McIlwain did not submit a declaration from Rachel Cook, the Court will not award the $16,900 of fees Mr. McIlwain claims on her behalf. Each of the declarations states that the declarant has not been paid by Mr. McIlwain but that he or she performed work for Mr. McIlwain with the understanding that he would pay him or her "upon the successful conclusion of the case." Each of the declarants further states that he or she had an understanding that "if Mr. McIlwain received an excellent result, he would pay [him or her] a bonus or multiplier" so that he or she would receive an amount greater than a lodestar calculated with his or her usual hourly rate.

Having reviewed the declarations of these individuals, only one of whom was able to provide a time record adequately itemizing the hours claimed by the tasks completed, the Court is troubled by Mr. McIlwain's original claim of fees on their behalf. Mr. McIlwain claimed specific amounts of time that appear to have no basis in fact. For example, Mr. McIlwain claimed 34.8 hours of time on behalf of Kris Nejat. However, Mr. Nejat's declaration provides no itemization of time and states that he "worked well in excess of 100 hours on the Hart matter." Nejat Decl., Docket No. 1276-6 at ¶ 5. See also, Settle Decl., Docket No. 1276-8 at ¶ 2 (stating that the total work performed was well in excess of thirty-five hours while Mr. McIlwain claimed 51.40 hours of time on Mr. Settle's behalf); Amadeo Decl., Docket No. 1276-1 at ¶ 5 (stating that the total work performed exceeded 300 hours while Mr. McIlwain claimed 120.20 hours on Mr. Amadeo's behalf). Mr. McIlwain provides no basis for the hours he claims on behalf of the individuals he purportedly supervised. The lack of foundation for these claims also calls into question the reliability of his own time records.

    i.    Katie Saluzzi

Mr. McIlwain claims $48,375 of fees on behalf of paralegal Katie Saluzzi for 225 hours of work performed at a rate of $215 per hour. In her declaration, Ms. Saluzzi states that she worked "with Mr. McIlwain as a paralegal consultant" but that she "was at no time considered his employee," paid a salary or paid an hourly

United States District Court
For the Northern District of California

rate.  Saluzzi Dec., Ex. 1276-7 at ¶ 2.  Ms. Saluzzi further

declares that she prepared a "Certification of Services" for the

Hart case that itemizes her time by the tasks completed and

submitted it to Mr. McIlwain with the understanding that "upon the

successful conclusion of the case" she would be paid $48,735.[17]

Id. at ¶ 3.  Ms. Saluzzi declares that she had worked on other

matters with Mr. McIlwain and billed him at a rate of $215 per

hour.  Id.

Neither Ms. Saluzzi nor Mr. McIlwain provides any support for

Ms. Saluzzi's claimed hourly rate.  The Court notes that the

McKenna Law Firm claimed an hourly rate of $105 for its paralegals

and Hagens Berman claimed rates of $150-$190 per hour for

paralegals with much more experience than Ms. Saluzzi.

Accordingly, the Court reduces Ms. Saluzzi's hourly rate to $105,

with a corresponding lodestar reduction to $23,625.

In addition, the Court will make reductions to the hours

claimed on Ms. Saluzzi's behalf.  Ms. Saluzzi has included in her

time record sixty-one hours of work performed after September 30,

2013, when Mr. McIlwain was informed by Mr. Hart that he was no

longer authorized to work on the case.  These fees cannot

reasonably be related to the successful litigation and settlement

---

[17] Although Ms. Saluzzi states that the "Certification of
Services" was prepared for the Hart litigation and the document is
printed with the District of New Jersey caption for the case, it
is not clear that the document was requested by the New Jersey
court or filed on Hart docket.

United States District Court
For the Northern District of California

of the case.   Accordingly, the Court reduces the lodestar by

$6,405 to account for these hours.   In addition, as discussed

above, Ms. Saluzzi and Mr. McIlwain both billed for numerous phone

conferences "re: status" while the case was under submission

before the Third Circuit.   These fees are not reasonably related

to the successful litigation and settlement of the case.   Ms.

Saluzzi billed 10.75 hours of time for these telephone calls.   The

Court will reduce her lodestar by $1130 to account for this time.

Ms. Saluzzi's reduced lodestar is $16,090.

In addition, Ms. Saluzzi's time records overstate her

contribution to the litigation of <u>Hart</u> in other ways.   First, she

recorded her time in quarter-hour increments.   The time record

includes many entries for filing or telephone calls that likely

took one or two tenths of an hour instead of a quarter hour.   In

addition, Ms. Saluzzi billed for clerical tasks.   <u>See, e.g.</u>,

Saluzzi Dec., Docket No. 1276-7, Ex. B at 4 (claiming time for

making travel arrangements).   "[P]urely clerical or secretarial

tasks should not be billed at a paralegal rate or lawyer's rate,

regardless of who performs them."   <u>Davis v. City of San Francisco</u>,

976 F.2d 1536, 1543 (9th Cir. 1992) (quoting <u>Missouri v. Jenkins</u>,

491 U.S. 274, 288 n.10 (1989)) (internal alteration marks

omitted).   Finally, a large percentage of Ms. Saluzzi's time

entries are for meetings or telephone calls which do not appear to

be related to work performed.   The Court will reduce the remaining

lodestar by fifteen percent to account for these factors.

United States District Court
For the Northern District of California

The Court will award Ms. Saluzzi $13,700.

ii.  Joseph Cane

Mr. McIlwain claims $178,500 in fees on behalf of Joseph Cane, representing 210 hours of work at a rate of $850 per hour. Mr. Cane declares that he "was a consistent and constant consultant" to Mr. McIlwain throughout his representation of Mr. Hart.  Cane Dec., Docket No. 1276-2 at ¶ 4.

Despite the Court's instructions, Mr. Cane's declaration does not state what his standard hourly rate was, or any rate agreed upon between him and Mr. McIlwain.  In addition, Mr. Cane provides only the most general summary of his time.  For example, he states, "During the period from November through December, 2007, I spent over 18 hours conferring with Tim McIlwain about researching the theories of liability to be asserted in the Hart case, about Troy Taylor's participation as a class representative, about the merit of including other and multiple athletes as class representatives, and about the differences in various states' laws governing the rights of publicity."  Id. at ¶ 5.  Mr. Cane does not provide any information about how, eight years later, he is able to remember how many hours he spent assisting Mr. McIlwain during those months or the tasks he performed.  The Court finds that Mr. Cane's declaration is not adequate to support an award of fees and declines to award any of the fees claimed on his behalf. See Hensley, 461 U.S. at 433 ("Where the documentation of hours is

1  inadequate, the district court may reduce the award

2  accordingly.").

3              iii. Corrine Mullen

4     Mr. McIlwain claims $52,700 in fees on behalf of Corrine

5  Mullen, representing sixty-two hours at a rate of $850 per hour.

6  Ms. Mullen, however, declares that her standard hourly rate is

7  $450 per hour.

8     Ms. Mullen declares that her "work on the Hart case with Mr.

9  McIlwain involved the research and drafting of points and

10 authorities in opposition to EA's motion to dismiss or in the

11 alternative motion for summary judgment" between December 10 and

12 December 23, 2010, preparation for oral argument on the motion and

13 drafting supplemental letter briefs filed in July 2011.  Mullen

14 Dec., Docket No. 1276-5 at ¶ 3.  Ms. Mullen does not provide any

15 further itemization of her time, but states that she "spent at

16 least 62.5 hours on that work."  Id.  Ms. Mullen does not state

17 how she is able to state with certainty that she spent the amount

18 of time claimed on these tasks.  The Court finds that Ms. Mullen's

19 declaration is not adequate to support an award of fees and

20 declines to award any fees claimed on her behalf.  See Hensley,

21 461 U.S. at 433.

22             iv.  Amber Jorgensen

23    Mr. McIlwain claims $101,855 in fees on behalf of Amber

24 Jorgensen, representing 287 hours at a rate of $355 per hour.  Ms.

25 Jorgensen declares that her standard hourly rate is $355.  The

United States District Court
For the Northern District of California

Court notes that Ms. Jorgensen was a law student for part of the time that she worked on the case but that she states a single hourly rate. The Court finds that an hourly rate of $275 is more appropriate for Ms. Jorgensen's work. Like the other declarants, Ms. Jorgensen states that she expected Mr. McIlwain to pay her for her time "upon the successful conclusion of the case." Jorgensen Dec., Docket No. 1276-4 at ¶ 10. However, Ms. Jorgensen also states that "some unallocated portion" of a $3,000 payment from Mr. McIlwain to her was for work related to Hart. Id. at ¶ 11. She states that the payment "was not intended to relate solely or predominantly" to her work on Hart because she worked on other matters for Mr. McIlwain during the same time period. Id.

Ms. Jorgensen attaches a document she prepared for purposes of this fee request, which she declares summarizes work done "to the extent I can readily verify by written record, including, without limitation, a description of the documents reviewed and written by me (in whole and in part), the topics of research, a general acknowledgment of communications in which I participated." Id. at 8. The tasks are grouped by month from February 2010 through July 2013 and include a total number of hours for each month ranging from a low of one-quarter of an hour in May 2011 to a high of sixty-five hours in February 2010. Id. at Ex. A. The summary includes a total of 232.25 hours of claimed work. Ms. Jorgensen further declares that due to the passage of time she is unable to describe further details of the work she performed, but

she estimates that she spent more than 300 hours in total on the case. Although Ms. Jorgensen relied on written records to compile her time summary, the Court finds that her monthly estimates of time spent make it difficult to assess the reliability of the estimated time spent. Moreover, in some months, the only time Ms. Jorgensen billed was for reviewing case documents and telephone calls or emails, not for the creation of any work product. See, e.g., Entries for January 2011, February 2011, March 2011, May 2011, November 2011, December 2011, January 2012, February 2012, April 2012. Accordingly, the Court will reduce the time claimed on the summary by eighty percent to a total of forty-six hours. The Court will not award any fees for time not documented on the summary. In addition, the Court will reduce the amount to be awarded to Ms. Jorgensen by $3,000, the amount previously paid by Mr. McIlwain to Ms. Jorgensen. The Court awards Ms. Jorgensen $10,900 in fees.

v.   William Amadeo

Mr. McIlwain claims $42,671 in fees on behalf of William Amadeo, representing 120.20 hours at a rate of $355 per hour. Mr. Amadeo declares that his usual hourly rate is $355 per hour. Mr. Amadeo attaches to his declaration a summary of time he spent working on Hart and another purportedly related case, Brown. However, the summary is entirely unreliable. Most of the entries are for at least six hours, and some are for as many as forty-four hours. The descriptions for many of the tasks are vague. See,

_e.g._, Entry for October 3, 2008 (claiming eight hours to "Review what users came up with"); Entry for December 26, 2008 (claiming eight hours to "Organization of research for TM"); Entry for January 21, 2009 (claiming eight hours to "Research done for appeal process"). Other entries are clearly excessive. _See, e.g._, Entries for October 1, 2008, October 2, 2008, October 3, 2008, February 20, 2009 and February 21, 2009 (claiming a total of forty-six hours to research and write a memo on a single case); Entries for January 22, 2009 and February 15, 2009 (claiming a total of twenty-two hours to research the relevance of the Class Action Fairness Act to the case). On several days, Mr. Amadeo purports to have worked as many as twenty billable hours. _See, e.g._, Entries for October 3, 2008 (twenty hours); Entries for October 2, 2008 (sixteen hours); Entries for October 22, 2008 (eighteen hours). Other entries are clearly erroneous if not false. _See, e.g._, January 11, 2009 Entry (claiming eight hours to "Did research on O'Bannon Class" although O'Bannon was not filed until July 2009).

The Court finds that Mr. Amadeo's declaration is not adequate to support an award of fees and declines to award any fees claimed on his behalf. _See Hensley_, 461 U.S. at 433.

### vi. Kris Nejat

Mr. McIlwain claims $12,354 in fees on behalf of Kris Nejat, representing 34.80 hours at a rate of $355 per hour. Mr. Nejat does not provide his usual hourly rate or the hourly rate he

United States District Court
For the Northern District of California

agreed to bill Mr. McIlwain. In addition, Mr. Nejat provides only the most general description of the work he performed with the rough estimate that he "worked well in excess of 100 hours on the <u>Hart</u> matter." Nejat Dec., Docket No. 1276-6 at ¶ 5. The Court finds that Mr. Nejat's declaration is not adequate to support an award of fees and declines to award any fees claimed on his behalf. <u>See</u> <u>Hensley</u>, 461 U.S. at 433.

### vii. Alex Settle

Mr. McIlwain claims $13,107 in fees on behalf of Alex Settle, representing 51.40 hours of work at a rate of $255 per hour. Mr. Settle does not provide his usual hourly rate or the hourly rate he agreed to bill Mr. McIlwain. Moreover, Mr. Settle's general description of the tasks he completed does not support an award of fees. Mr. Settle declares that he worked in "excess of 35 hours" on various tasks. His descriptions of some tasks, such as "there were numerous discussions and meetings that involved the case" and "I was involved in additional legal research and writing for the briefs in the case," are vague. Settle Decl., Docket No. 1267-8 at ¶ 2. Mr. Settle also states that he worked on the creation of the website youareinthegame.org. However, as discussed above, there is no evidence that the website contributed to the successful litigation or settlement of <u>Hart</u>. The Court finds that Mr. Settle's declaration is not adequate to support an award of fees and declines to award any fees claimed on his behalf.

viii.   Katrina Yu

Mr. McIlwain claims $6,120 in fees on behalf of Katrina Yu, representing 24.50 hours of work at a rate of $250 per hour.  Ms. Yu does not provide her usual hourly rate or the hourly rate she agreed to bill Mr. McIlwain.  Ms. Yu declares that her approximately twenty-five hours of work on the case was limited to attending a seminar at which an EA executive was a panelist.  Mr. McIlwain directed Ms. Yu to take notes and to ask certain questions.  It is not clear that Ms. Yu's attendance at the seminar contributed to the successful litigation or settlement of Hart.  Accordingly, the Court will not award fees on Ms. Yu's behalf.

ix.   Ron Chini

Mr. McIlwain claims $18,748 in fees on behalf of Ron Chini, representing 87.20 hours of work at a rate of $215 per hour.  Mr. Chini does not provide his usual hourly rate or the hourly rate he agreed to bill Mr. McIlwain.  Mr. Chini declares that he spent more than 100 hours working on Hart between January and April 2009.  It appears from Mr. Chini's declaration that he reviewed EA videogames, in an attempt to find instances of recognizable individuals in the games, and summarized other law students' work on the same project.  Because neither Mr. McIlwain nor Mr. Chini provides any basis for the rate claimed on Mr. Chini's behalf and Mr. Chini provides no basis for his estimate of the number of

United States District Court
For the Northern District of California

hours claimed, the Court will not award any fees on Mr. Chini's behalf.

### c.   The Lanier Firm

Finally, Mr. McIlwain initially claimed a lodestar of $464,470 on behalf of attorneys from the Lanier Firm, representing over 600 hours of time billed at rates ranging from $500 per hour to $900 per hour.  The Court directed Mr. McIlwain to submit a supplemental declaration from Eugene Egdorf to support these fees. Mr. McIlwain has submitted a declaration from Mr. Egdorf in which he reduces the rates claimed to a range of $350 per hour to $900 per hour for a reduced lodestar of $313,838.[18]

The Court finds that the time records submitted by Mr. Egdorf generally support an award of fees for the hours claimed in the lodestar.  However, Mr. Egdorf has included 23.25 hours of work performed after September 30, 2013, when his firm and Mr. McIlwain were informed by Mr. Hart that they were no longer authorized to represent him.  These fees cannot reasonably be understood to be related to the successful litigation and settlement of the case. Accordingly, the Court reduces the lodestar by $20,076 to account for these hours.  More importantly, the Court finds that the evidence submitted does not support a finding that the reduced hourly rates claimed are reasonable.  For example, Mr. McIlwain

---

[18] The Court notes that the supplemental declaration also reduces the number of hours claimed by Ryan Ellis from 151 to fifty-one.

United States District Court
For the Northern District of California

seeks a rate of $500 per hour for a senior legal research associate who graduated from law school in 2003 and who "works on commercial litigation cases, with an emphasis on bankruptcy-related lititgation." Egdorf Dec. at Ex. D; see also, e.g., id. at ¶ 22 and Ex. C (claiming a rate of $500 for a senior litigation associate who graduated from law school in 2005 and whose "practice centers on bankruptcy-related litigation as well as all stages of the commercial chapter 11 and chapter 7 process"). Accordingly, the Court will reduce the lodestar claimed by an additional ten percent, for a total of $264,400.

Accordingly, the Court awards former Hart counsel a total of $696,700 in fees.

III. Costs

The NCAA settlement agreement allowed Plaintiffs' counsel to seek up to $500,000 in costs and expenses. The EA settlement agreement allowed Plaintiffs' counsel to seek up $2,500,000 in costs and expenses. The total amount of costs requested by Plaintiffs is less than the maximum permitted under the settlement agreements. Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters. See Harris v. Marhoefer, 24 F.3d 16, 19 (9th Cir. 1994). The costs claimed here are recoverable to the extent they were

United States District Court
For the Northern District of California

necessary to secure the resolution of the litigation and are
reasonable in amount. See In re Immune Response Sec. Litig., 497
F. Supp. 2d 1166, 1177-78 (S.D. Cal. 2007); In re Media Vision
Tech. Sec. Litig., 913 F. Supp. 1362, 1366 (N.D. Cal. 1995).

A.   Keller Plaintiffs' Counsel

Keller Plaintiffs' counsel seek a total of $448,868.40 in
costs, half of which they seek from the NCAA and half of which
they seek from EA.  The Court finds that Keller Plaintiffs'
counsel have sufficiently documented their requested costs and
established that they were necessary to secure the resolution of
the litigation.  Accordingly, the Court grants Keller Plaintiffs'
counsel's request for $224,434.20 in costs from the NCAA fund and
$224,434.20 in costs from the EA fund.

B.   O'Bannon Plaintiffs' Counsel

O'Bannon Plaintiffs' counsel requested $1,836,505.89 in
costs, which they now agree should be reduced by $16,541.89 to
$1,819,964.  This reduction represents the amount claimed by
O'Bannon Plaintiffs' counsel in their motion for fees from the
NCAA and awarded in Magistrate Judge Cousin's July 13, 2015 order.
See O'Bannon Docket No. 405.  The Court finds the costs to be
sufficiently documented and necessary to secure the resolution of
the litigation.  The Court grants O'Bannon Plaintiffs' counsel's
request for $1,819,964 in costs from the EA fund.

United States District Court
For the Northern District of California

C.   Hart Plaintiffs' Current Counsel

Hart Plaintiffs' current counsel seek $13,741.77 in costs. As discussed above, Hart Plaintiffs' counsel's fee request was not properly documented.  This extends to their request for costs. Accordingly, the Court reduces the request by ten percent and awards $12,367.59 in costs to Hart Plaintiffs' current counsel from the EA fund.  See Moreno v. City of Sacramento, 534 F.3d 1006, 1112 (9th Cir. 2007) (allowing trial court to "impose a small reduction, no greater than 10 percent--a 'haircut'--based on its exercise of discretion and without a more specific explanation").

D.   Former Counsel for Hart Plaintiffs

Mr. McIlwain seeks $76,209.91 in costs on behalf of himself and co-counsel, the Lanier Law Firm.  The Court awards a total of $45,810.58.  As discussed above, Mr. McIlwain's records filed in support of his request for fees and costs include entries for travel without a stated purpose.  The Court declines to award costs related to such travel.  Mr. McIlwain has not demonstrated that this travel was reasonable or necessary to secure the resolution of this litigation.  In addition, Mr. McIlwain's records include unexplained charges at various stores, including office supply stores.  Again, Mr. McIlwain's records do not demonstrate that these costs were reasonable or necessary. Moreover, office supplies are overhead that should not ordinarily be billed to a client.  See Missouri v. Jenkins, 491 U.S. 274, 296

50

(1989) ("[A] prudent attorney customarily includes . . . office overhead . . . in his own hourly billing rate."). Finally, Mr. McIlwain includes significant expenses related to payments to individuals with no explanation for who those individuals are or why their employment was reasonable or necessary. Accordingly, the Court reduces Mr. McIlwain's expenses by $27,851.73 and awards him $22,882.18 in costs.

In addition, the expenses claimed by the Lanier Law Firm are not itemized or supported by an adequate declaration. Accordingly, the Court reduces the Lanier Law Firm's request by ten percent and awards $22,928.40 in costs from the EA fund. See Moreno, 534 F.3d at 1112 (allowing a ten percent "haircut").

## CONCLUSION

For the reasons stated above, the Court GRANTS Keller Plaintiffs' counsel' motion for $5,800,000 in attorneys' fees and $224,434.20 in costs under the NCAA settlement. In addition, the Court GRANTS Keller Plaintiffs' counsel $5,721,000, O'Bannon Plaintiffs' counsel $4,000,000, current counsel in Hart $260,000, and former counsel in Hart $696,700 in attorneys' fees from the EA fund. Two million dollars will be held in escrow, to be paid to O'Bannon Plaintiffs' counsel if they are not paid their fees by the NCAA and to be paid to Keller Plaintiffs' counsel if O'Bannon Plaintiffs' counsel are paid by the NCAA. Finally, the Court GRANTS grants Keller Plaintiffs' counsel $224,434, O'Bannon Plaintiffs' counsel $1,819,964, current counsel in Hart

United States District Court
For the Northern District of California

$12,367.59, and former counsel in Hart $45,810.58 in costs from the EA fund.

IT IS SO ORDERED.

Dated: December 10, 2015



CLAUDIA WILKEN
United States District Judge