IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| MCILWAIN, LLC, a/k/a Timothy J. McIlwain, Attorney at Law, <br><br> Plaintiff, <br><br> v. <br><br> Steve BERMAN, *et al.*, <br><br> Defendants. | Civil No. 17-1257 (RBK/KMW) <br><br> **OPINION** |

**KUGLER**, United States District Judge:

Plaintiff Timothy McIlwain did not get the fees he asked for in a class action settlement. He has now sued other class counsel—the law firm of Hagens Berman Sobol Shapiro, LLP ("Hagens Berman") and several of its partners—in an effort to pool together and then redistribute that same settlement. Now before the Court are Hagens Berman's Motion to Set Aside Default Judgment (mislabeled, as no judgment has been entered) (ECF No. 21), Steve Berman's Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 27), and Hagens Berman's Motion to Dismiss for Lack of Personal Jurisdiction. (ECF No. 30.)

Because McIlwain's claims involve actions that took place almost entirely outside of New Jersey—indeed, thousands of miles away in California—we find that the Court lacks personal jurisdiction over Defendants. We also conclude that it is appropriate to set aside the Clerk's entry of default. Defendants' motions are therefore **GRANTED**.

Finally, the Court finds that McIlwain could have brought this case in the Northern District of California and that it is in the interests of justice to transfer it there pursuant to 28 U.S.C. § 1631.

## I. BACKGROUND

This attorneys' fees dispute is set forth in great detail in an August 19, 2015 order by Judge Wilken of the Northern District of California. *See Keller v. Nat'l Collegiate Athletic Ass'n*, 2015 WL 8916392 (N.D. Cal. Dec. 15, 2015). We recount the facts necessary to render a judgment on whether this Court may exercise personal jurisdiction over Defendants.

### A. Lawsuits Filed Against Electronic Arts

#### 1. The Keller Litigation

On May 5, 2009, Samuel Michael Keller, the former starting quarterback for the Arizona State University and University of Nebraska football teams, filed a class action in the U.S. District Court for the Northern District of California, alleging that the National Collegiate Athletic Association ("NCAA") had violated his right to publicity by using his likeness in videogames produced by Electronic Arts ("EA"). *See* Compl., *Keller v. Electronic Arts, Inc.*, Civ. No. 09-1967 (ECF No. 1). Keller's counsel in the matter was the law firm of Hagens Berman Sobol Shapiro, LLP. Defendants Steve W. Berman, Robert B. Carey, and Leonard W. Aragon are all members of the firm.

On February 8, 2010, Judge Wilken of the Northern District of California denied EA Sport's "Anti-SLAPP" motion, so-named because of California's Strategic Lawsuits Against Public Participation statute, a law designed to mitigate the speech-chilling effects of litigation. *See Keller v. Elecs. Arts, Inc.*, No. C 09-1967 CW, 2010 WL 530108, at *1 (N.D. Cal. Feb. 8, 2010). In so doing, the *Keller* court rejected EA's argument that its games were transformative works protected by the First Amendment. *Id.* at *9. EA filed an interlocutory appeal of the order.

2. *The* Hart *Litigation*

On June 12, 2009, two months after *Keller* was filed, Ryan Hart, a former quarterback on the Rutgers University football team, and Troy Taylor, a former professional football player, filed a similar class action against EA, this time in the Superior Court of New Jersey. After the complaint was amended (and Taylor left the case), Hart's new complaint brought claims under New Jersey common law. It was then removed to the U.S. District Court for the District of New Jersey pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(d), 1453, and 1711-1715. *See Hart v. Electronic Arts, Inc.*, Civ. No. 3:09-5990. Hart's counsel was the law firm of McKenna McIlwain, LLP, now defunct. The firms' members were Keith A. McKenna and Timothy J. McIlwain, the latter of whom is the Plaintiff in this matter. At summary judgment, the *Hart* court found that EA was entitled to assert a First Amendment defense to the right to publicity claims. *See Hart v. Elec. Arts, Inc.*, 808 F. Supp. 2d 757, 760 (D.N.J. 2011). Hart appealed.

Finally, on July 21, 2009, another group of plaintiffs sued EA as a putative class action, alleging a set of antitrust violations in a suit before the Northern District of California. *See O'Bannon v. NCAA*, Civ. No. 09-3329. The *O'Bannon* plaintiffs appear to have been the primary drivers of discovery in the cases before the Northern District of California, and for purposes of this decision it is sufficient to note that they were to receive a significant share of the eventual settlement.

**B.** *Keller* **and** *Hart* **Appealed**

*Hart* was heard first on appeal, represented by McKenna McIlwain and the law firm of Altshuler Berzon LLP. On January 25, 2012, Keith McKenna filed a notice of substitution of attorney, substituting the McKenna Law Firm, LLC for McKenna McIlwain. One day before Hart's opening brief was due, McIlwain filed yet another notice of substitution of attorney,

3

substituting himself, Timothy McIlwain, for McKenna McIlwain. The McKenna Law Firm withdrew.

On May 21, 2013, the Third Circuit reversed the district court's grant of summary judgment, finding that the transformative use test used by the *Keller* court was the "proper analytical framework to apply." *Hart v. Electronic Arts, Inc.*¸717 F.3d 141, 165 (3d Cir. 2013). Hart's briefing before the Third Circuit explicitly relied on the disposition in *Keller*, noting that he argued the "precise conclusion" reached by that court. The Third Circuit also noted in its opinion that "*Keller* is simply our own case incarnated in California." *Id.* at 163 n.28.

A few weeks later, on July 31, 2013, the Ninth Circuit affirmed the *Keller* district court's order denying EA's Anti-SLAPP motion. *See In re: NCAA Student-Athlete Name & Likeness Licensing Litigation*, 724 F.3d 1268 (9th Cir. 2013). The Ninth Circuit relied on the reasoning in *Hart*, along with other precedent. *Id.* at 1278.

### C. Negotiations and Settlement

In June of 2013, Mr. McIlwain, on behalf of his firm, met with Hagens Berman at one of its offices in San Francisco, California, where they discussed a plan for the *Hart* and *Keller* cases, including whether to consolidate the actions and how to divide fees between the firms. (Compl. at 4.) McIlwain has presented several emails between him and Robert Carey, a partner of Hagens Berman, that discussed the possibility of them cooperating and setting up a fee-sharing arrangement for the *Keller* and *Hart*. For example, Carey told Plaintiff via an email that Hagens Berman would prefer for McIlwain to work with them, but "[i]f you are simply set on having a fight to control the class, we are comfortable intervening in your case and seeking lead counsel appointment on your case." (*Id.*) In subsequent emails, Carey and McIlwain discussed the

possibility of working together, with Carey saying he was "not trying to freeze you out or deny you your rightful credit and role." (*Id.*)

On August 25, 2013, Hagens Berman filed a putative class action lawsuit in the District of New Jersey that presented the same theory of liability as the *Hart* case already pending in that district. *See Alston v. Electronic Arts, Inc.*, Civ. No. 13-5157. Defendant Steve Berman submitted a *pro hac vice* application to the New Jersey district court, and he has previously appeared *pro hac vice* in other matters in the state. It appears *Alston* was filed as part of a contingency plan to usurp leadership of the putative class in *Hart*.

The parties in *Keller*, *Hart*, and *O'Bannon* had all attempted to settle their respective cases as early as 2011, without success. On September 10, 2013, the cases proceeded to a joint mediation before Randy Wulffe in California. Plaintiffs' counsel in all three cases agreed to a settlement in principle, agreeing to an amount of approximately $40,000,000. At the time of the mediation, Hart was represented by Timothy McIlwain. During the mediation process, Eugene Egdorf of the Lanier Law Firm, McIlwain's co-counsel, sent an email to Steve Berman and Robert Carey of Hagens Berman and to Timothy McIlwain on September 24, 2013. That email ("the Email Agreement") provided as follows:

> I am writing to confirm what I understand our agreement to be regarding the current proposal from Randy Wulffe to settle the EA litigation (*Hart*, *Keller*, and *O'Bannon*). Please confirm your agreement, or of course advise of any changes.
>
> 1. We agree to work together in the submission of applications for fees and expenses;
>
> 2. We agree to support each other concerning the substance and merits of our fee submissions;
>
> 3. We agree to support each other and collectively, as appropriate, contest any applications for fees and expenses from other firms;

5

4. For any fee award or agreement to our firms (Hagens Berman, The Lanier Law Firm, and Tim McIlwain), we agree to consider those as a joint award which will be pooled together for our collective group;

5. From that joint award to our collective group, irrespective of the methodology, substance and distribution ordered by the Court, we agree that 60% of such fees will be paid to Hagens Berman, and the remaining 40% to Lanier and McIlwain;

6. Each of the firms can submit a request for recovery of their reasonable expenses, and we will support each other in that regard;

7. Lanier and McIlwain will be added as counsel to the *Keller* case against the NCAA; the above agreement concerning the distribution of fees on a 60/40 basis will NOT apply to that relationship, which will instead be governed by either a future separate agreement or by Court Order.

(Compl. Ex. A.) Steve Berman replied, to all, "this is agreed." (*Id.*)

Toward the close of the mediation, McIlwain and Egdorf signed a Term Sheet dated September 26, 2013, setting forth the bases for the settlement. (Pl. Resp. Ex. D.) No one else signed this document.

This appears to have caused a new crisis. McIlwain's client at the time, Ryan Hart, has stated that he first heard about this proposed settlement from an article in the Wall Street Journal on September 26, 2013. (*See* Decl. of Ryan Hart, Def. Resp. Ex. 1.) McIlwain had not told him about this, and when Hart asked, McIlwain took nearly two days respond to his inquiries. (*See id.* ("I took a break from phone this weekend. Football and beer. I will let you know . . .")). Hart subsequently terminated McIlwain's representation. (*Id.*) Hart also rejected the agreement, and once again exchanged McIlwain for the McKenna Law Firm, along with the law firm of Lum, Drasco & Positan LLC. *See Keller*, 2015 WL 8916392, at *3. After further negotiations, lengthened by the on-boarding of Hart's new counsel, the parties reached a later agreement in 2014, and the Northern District of California then approved the settlement. *Id.* The parties submitted their fee applications.

The EA Settlement fund was for $40,000,000. Judge Wilken noted that under the applicable law of the Ninth Circuit the plaintiffs' counsel could seek up to thirty-three percent of the fund, or $13,200,000. *Keller*, 2015 WL 8916392, at *4-5. A $20,000,000 fund was also established as well for claims concerning the NCAA, under which the plaintiffs' counsel— McIlwain was excluded from this—could seek twenty-nine percent of the fund, or $5,800,000 in attorneys' fees. *Id.*

McIlwain's fee application argued that for his work in *Hart*, he should have received $4,000,000 in fees. He contended that the Third Circuit's decision in *Hart* was the catalyst for the Ninth Circuit's decision that affirmed the district court's decision in *Keller*, prompting settlement. Put differently, Plaintiff argued that the Ninth Circuit would not have affirmed *Keller* had the Third Circuit not reversed *Hart* by relying on *Keller*, even though the Third Circuit reached the same result as *Keller* and even though the Ninth Circuit subsequently affirmed *Keller* for substantially the same reasons. Judge Wilken disagreed with this convoluted conceptualization, finding that there was "little evidence that the *Hart* litigation contributed to the common fund" settlement. *Id.* at *9. McIlwain also argued that his agreement with the Defendants in this matter entitled him to 40% of the recovery—essentially the same argument he raises today—but the court did not explore this in depth. It only noted that the argument had been raised. *Keller*, 2015 WL 8916392, at *6.

After distributing fees to other plaintiffs' counsel, the *Keller* court turned to the $2,075,175 lodestar claimed by McIlwain for his work in *Hart*, in which he claimed he had billed 2,453.20 hours at an hourly rate of $850.

Plaintiff's support for this sum may be fairly called absurd. McIlwain's stated hourly rate was in excess even of the rate—$750—presented by his own expert in support of his fee application, a sum itself deemed far too high. And in a five-page survey of the sundry items

Plaintiff attempted to bill, the *Keller* court noted that McIlwain tried to pass off, among other things: 8.3 hours of travel as billable despite having no apparent significance to the case at hand; hours of research on the video game "Call of Duty"; several hours spent searching IMDB for actors who had starred in the film "Ocean's 13"; and several "memos to file" that had no topic and no clear purpose. *Keller*, 2015 WL 8916392, at *12-13. Most egregiously, McIlwain attempted to claim nearly $500,000 in fees on behalf of other attorneys, law students, and paralegals, including $101,855 in fees on behalf of just one law student, representing 287 hours working at a claimed rate of $355 an hour.[1] In light of this (and much more), the court was "troubled" and awarded $694,000 to McIlwain and his co-counsel, the Lanier Firm. *Keller*, 2015 WL 8916392, at *12. All told, the *Keller* court awarded $5,721,000 to the plaintiffs' counsel in *Keller*, $694,000 to the plaintiffs' counsel in *Hart*, and $2,000,000 was held in escrow pending the resolution of the *O'Bannon* litigation. McIlwain ultimately received $405,000 of the sum given to counsel for the *Hart* litigation.

McIlwain later filed this lawsuit. He alleges that the Email Agreement was breached because Defendants "did not work together in the submission of applications for fees and expenses, or to support the substance and merits of the fee submissions" in a subsequent fee application to the Northern District of California. (Compl. at ¶ 12.) McIlwain also alleges that he did not get help from Defendants when he filed this application, which he alleges was breach as well. (*Id.* at ¶ 14.) McIlwain claims that "[t]he beach [sic] of the agreement to cooperate and support caused him suffer consequential damages, including paying for legal support to assist in the preparation of the his fee application." (*Id.* at ¶ 15.) Defendants are also alleged to have failed to add McIlwain to

---

[1] This was reduced to 47 hours at a rate of $275 an hour.

"the NCAA case"—the Court assumes this refers to *Keller*, as the NCAA was not a party to *Hart*—which also resulted in a loss of counsel fees. (*Id.* at ¶ 16.)

Perhaps most significantly, McIlwain maintains—apparently irrespective of the *Keller* ruling on fees—that all these fees should have been pooled together pursuant to the Email Agreement. Under that Agreement, he claims he is entitled to more money than he received from the Northern District of California, and he also seeks injunctive relief directing that any fees in escrow "be subject to pooling and distribution" per the Agreement. McIlwain's complaint also claims he "originated the right of publicity theory of liability for athletes," though it is not clear what he means by this.

## II. DISCUSSION

### A. Setting Aside the Clerk's Entry of Default

Hagens Berman has moved to set aside the clerk's entry of default, improperly termed a "default judgment," as no judgment has been entered in this case. The motion is unopposed.

In general, federal courts disfavor defaults, and where a party moves to set aside a default, courts should decide doubtful cases in favor of the party moving to set aside a default entry "so that cases may be decided on their merits." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194-95 (3d Cir. 1984). Federal Rule of Civil Procedure 55(c) states that "[f]or good cause shown the court may set aside an entry of default." Fed. R. Civ. P. 55(c).

As we noted in a previous order (ECF No. 8) with respect to Steve Berman, the law firm of Hagens Berman has apparently meritorious defenses, namely that some of Plaintiff's arguments about attorneys' fees have been heard before by another court, *see Keller*, 2015 WL 8916392, at *12, and that this Court lacks personal jurisdiction. This is an issue better attended to on the merits. The clerk's entry of default is set aside.

### B. Personal Jurisdiction

When a defendant raises a personal jurisdictional objection, the plaintiff bears the burden of showing that jurisdiction is proper. *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). A plaintiff meets this burden by presenting a prima facie case for the exercise of personal jurisdiction, which requires that he or she establish "with reasonable particularity sufficient contacts between the defendant and the forum state." *Id.* (citing *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n*, 819 F.2d 434 (3d Cir. 1987)). It is insufficient to rely on the pleadings alone; rather, a plaintiff must establish facts relevant to personal jurisdiction by affidavits or other competent evidence. *Patterson v. Fed. Bureau of Investigation*, 893 F.2d 595, 603–04 (3d Cir.1990) (citing *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n.9 (3d Cir. 1984)). *See also North Penn Gas v. Corning Natural Gas*, 897 F.2d 687, 688 (3d Cir. 1990) ("A determination of minimum contacts is based upon findings of fact.").[2]

To exercise personal jurisdiction over a defendant, a federal court sitting in diversity must undertake a two-step inquiry. *IMO Indus., Inc. v. Kiekert, AG*, 155 F.3d 254, 259 (3d Cir. 1998). First, the court must apply the relevant state long-arm statute to see if it permits the exercise of personal jurisdiction. *Id.*; *see Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (quoting Fed. R. Civ. P. 4(k)) ("[A] federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state."). Second, the

---

[2] Defendants are mistaken that the Court may not consider matters outside the pleadings on a motion to dismiss for lack of personal jurisdiction. *See Time Share Vacation Club*, 735 F.2d at 67 n.9 (a motion to dismiss for lack of personal jurisdiction "inherently . . . requires resolution of factual issues outside the pleadings . . . the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence"). Defendants appear to conflate the instant motion with a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), which evaluates the sufficiency of the pleadings and therefore focuses on only the complaint itself. That's not the case here.

court must apply the principles of due process. *IMO Indus., Inc.*, 155 F.3d at 259. In New Jersey, this inquiry is combined into a single step because the New Jersey long-arm statute permits the exercise of personal jurisdiction to the fullest extent permissible under the Due Process Clause. *Id.*; *see Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 145 (3d Cir. 1992) (citing N.J. Court R. 4:4-4(c)) ("The New Jersey long-arm rule extends to the limits of the Fourteenth Amendment Due Process protection.").

Due process permits the exercise of personal jurisdiction over a nonresident defendant where the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Provident Nat'l Bank*, 819 F.2d at 437 (internal citations and quotations omitted). A plaintiff may establish jurisdiction by proving the existence of either specific or general jurisdiction. *Id.* To establish specific jurisdiction, a plaintiff must demonstrate that "the particular cause of action sued upon arose from the defendant's activities within the forum state." *Id.* On the other hand, to establish general jurisdiction, the plaintiff must "show significantly more than mere minimum contacts"; the defendant's forum contacts must be "continuous and substantial." *Id.* (citing *Gehling v. St. George's Sch. of Med., Ltd.*, 773 F.2d 539, 541 (3d Cir. 1985); *Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am.*, 651 F.2d 877 (3d Cir. 1981)).

With respect to partnerships such as Hagens Berman, the weight of authority is that personal jurisdiction over one partner establishes personal jurisdiction over the partnership. *See, e.g.*, *Price Waterhouse LLP v. First American Corp.*, 182 F.R.D. 56 (S.D.N.Y. 1998) (valid service upon one partner conveys personal jurisdiction over partnership); *see generally* Wright & Miller, 4A Federal Practice & Procedure § 1069.4 (4th ed.). Accordingly, we treat them together for purposes of this inquiry.

*1. General Jurisdiction*

To the extent that Mr. McIlwain argues that this Court can exercise general jurisdiction over Defendants, we find his contentions meritless. Such jurisdiction is only appropriate where a defendant's contacts with the forum state are "so continuous and systematic as to render them essentially at home in the forum state." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citations omitted). "[T]he paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (citations omitted). The only contacts Defendants are alleged to have had with the state are filing the *Alston* suit and engaging in a few phone calls and emails with McIlwain. In addition, Steve Berman had *pro hac vice* status in *Alston*, though this is immaterial, as *Alston* has nothing to do with the current dispute. *See Ajax Enterprises, Inc. v. Szymoniak Law Firm, P.A.*, 2008 WL 1733095, at *4 (D.N.J. Apr. 10, 2008) ("pro hac vice admission is insufficient to establish general jurisdiction because an attorney's pro hac vice appearance in an unrelated matter in the forum fails to establish general personal jurisdiction."). These are not enough contacts to deem Defendants "at home" in New Jersey, and thus the Court finds it lacks general jurisdiction over Defendants.

*2. Specific Jurisdiction*

The inquiry for specific jurisdiction has three parts. *See O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007). First, a defendant must have "purposefully directed [its] activities" at the forum. *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Second, the litigation must "arise out of or relate to" at least one of those activities. *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 (1984)). Third, if

those requirements are met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'" *Id.* (citing *Burger King¸* 471 U.S. at 476).

Specific jurisdiction is *specific*, and in this case, specifically about the alleged breach of contract. This is, as pleaded, a contract dispute. The contract was largely negotiated in California. It was circulated by McIlwain's co-counsel in Texas. Steve Berman agreed to it remotely, apparently from California but in any event not from New Jersey. Some of the fees targeted by McIlwain are in an escrow account governed by the laws of California. As for the Email Agreement itself, McIlwain claims the Agreement required Hagens Berman to support him in his fee application. The Court does not decide on whether that is the case today, but it does note that the parties' applications for fees took place before Judge Wilken in the Northern District of California, who has "an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). In essence, McIlwain seeks to redistribute a court-approved settlement per a contract formed in California by individuals, including McIlwain, who had traveled to California for that purpose. The substance of the Email Agreement and its subject matter concern California litigation. These facts do not suggest that Defendants purposefully directed their activities at New Jersey.

There are only a few facts presented by McIlwain that indicate Defendants may have purposefully availed themselves of New Jersey. He is correct that Hagens Berman purposefully filed *Alston* in New Jersey, though as we'll see that is otherwise irrelevant. Aside from that, the only facts that suggest Defendants deliberately reached into New Jersey are the negotiations prior to the Email Agreement. These are relevant, as we consider not only the contract but also "prior negotiations and contemplated future consequences, along with the terms of the contract and the

13

parties' actual course of dealing." *Burger King*, 471 U.S. at 479. Emails between Robert Carey and McIlwain discussed the prospect of cooperating in the EA litigation and about setting up a fee sharing arrangement. It also appears from the record that Carey and McIlwain spoke over the phone at least once regarding this.

These contacts are still insufficient. Although McIlwain argues these emails and phone calls establish personal jurisdiction over Defendants, the Third Circuit has made clear that "informational communications in furtherance of a contract between a resident and a nonresident does not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over the nonresident defendant." *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 152 (3d Cir. 1996) (citing *Sunbelt Corp. v. Noble, Denton & Assoc., Inc.*, 5 F.3d 28, 32 (3d Cir. 1993) (internal marks omitted)); *see also Stuart v. Spademan*, 772 F.2d 1185, 1193 (5th Cir. 1985) (stating that "an exchange of communications between a resident and a nonresident in developing a contract is insufficient of itself to be characterized as purposeful activity invoking the benefits and protection of the forum state's laws"). It would be one thing if the alleged contract was bargained for over the phone. It is another completely when the contract in dispute was the product not of these negotiations but of subsequent negotiations conducted in another state, months later, between the parties, a mediator, and companies defending against class action litigation. We find that the communications between Carey and McIlwain do not establish that Defendants purposefully availed themselves of the privilege of doing business in New Jersey.

We now turn to whether this litigation "arises out of or relates to" *Alston*, the only clear manifestation of an intent for Defendants to subject themselves to New Jersey law. "In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the

forum State.'" *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017) (citing *Goodyear*, 564 U.S. at 919). "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id. Alston* is not within the scope of the Email Agreement. No mention of *Alston* is made in the contract, and McIlwain had no involvement with its filing. The current dispute simply does not "arise out of or relate to" the filing of *Alston*, which was a separate case only tangentially involved with the proceedings underlying the alleged agreement.

We find that the Court lacks personal jurisdiction over Defendants. But we also note that to exercise such jurisdiction here would prejudice Defendants and simply waste the Court's resources when these very arguments have been heard by the *Keller* court in the Northern District of California. A federal court may only exercise personal jurisdiction if it otherwise comports with "traditional notions of fair play and substantial justice." *O'Connor*, 496 F.3d at 324; *see also Burger King*, 471 U.S. at 477. The Supreme Court has identified several factors that courts should consider when balancing jurisdictional reasonableness. Among them are "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies." *Burger King*, 471 U.S. at 477 (citations and internal marks omitted).

Several of these factors are relevant here. Almost the entirety of this dispute took place in California. As best the Court can tell this is a California contract, entered into by parties located in California at the time, in response to a California-based mediator's guidance, which involved a settlement subsequently approved by a federal judge in California concerning a case primarily litigated in California.

### C. § 1631 Transfer

If a district court finds that it lacks jurisdiction over an action, it must, "if it is in the interest of justice, transfer such action . . . to any other such court in which the action or appeal could have been brought at the time it was filed or noticed." 28 U.S.C. § 1631. To effect a transfer pursuant to § 1631, the Court must find (1) that the action "could have been brought" in the transferee district and (2) that transfer is in the interest of justice. *See, e.g.*, *D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 109 (3d Cir. 2009). The Court may *sua sponte* transfer for lack of personal jurisdiction. *See Island Insteel Sys., Inc. v. Waters*, 296 F.3d 200, 218 & n. 9 (3d Cir. 2002).

The parties have already litigated related matters in the Northern District of California and the question of the fee arrangement has already been presented to Judge Wilken of the Northern District of California, albeit in a slightly different context. And as we have noted, most contacts in this case appear to relate to California. We find that the Northern District of California would have proper venue, would have subject-matter jurisdiction over this diversity action, and could exercise personal jurisdiction over Defendants.

The Court also finds that transferring McIlwain's case is preferable to dismissal. First, Plaintiff could have originally filed this action in the Northern District of California. Second, transferring the case is in the interest of justice because otherwise there may be a statute-of-limitations bar on McIlwain's claims, which appear to arise some time in late 2013 to mid-2014, though that is not an issue before this Court. *Compare* N.J. Stat. Ann. § 2A:14-1 (six-year statute of limitations for written contracts) *with* Cal. Civ. Proc. Code § 337 (four years for written contracts). Lastly, transferring the case would prevent McIlwain from paying another filing fee.

### III. CONCLUSION

We find that the entry of default should be set aside and that the handful of emails and phone calls between Defendants and McIlwain do not suffice to establish either general or specific jurisdiction over Defendants. Defendants' motions are **GRANTED**. The Court will also transfer Plaintiff's claims to the Northern District of California. An order follows.


Dated:  May 24, 2018                                                    s/ Robert B. Kugler
                                                                        ROBERT B. KUGLER
                                                                        United States District Judge